(No. 4625- )

DIVANE BROS. ELECTRIC CO., A CORPORATION, Claimant, vs.
STATE OF ILLINOIS, Respondent.

*Opinion filed May 14, 1957.*

FLECK AND POLLACK, Attorneys for Claimant.

LATHAM CASTLE, Attorney General; RICHARD F. SIMAN, Assistant Attorney General, for Respondent.

TOLSON, C. J.

Divane Bros. Electric Company, A Corporation, filed its complaint on May 20, 1954, in which it seeks payment for certain work performed at the Illinois State Penitentiary, Pontiac, Illinois.

The record consists of the following:

1. Complaint.
2. Departmental Report.
3. Motion to strike and dismiss claimant's complaint in part.
4. Order dismissing motion, to strike, but without prejudice to raise such objections at the hearing of said cause.
5. Transcript of evidence.
6. Exhibits.
7. Stipulation waiving briefs and arguments.
8. Commissioner's Report.

The facts of the case are as follows:

On February 21, 1950, claimant entered into a contract with the State of Illinois for certain electrical work at the Pontiac Penitentiary under contract No. 66282, and, thereafter, on March 27, 1950, entered into a separate contract for other electrical work at the Pontiac Penitentiary under contract No. 66308.

The complaint is in Two Counts. Count One refers to contract No. 66282, wherein claimant alleges a balance

due it in the amount of $22,334.98. Respondent's motion to strike in part alleges that the sum of $15,699.22 is not a proper claim, and the amount asked should be reduced accordingly.

Under Count Two of the complaint, claimant alleges that there is a balance in the amount of $6,908.39 due under contract No. 66308, and respondent's motion to strike alleges that the sum of $6,261.20 should be stricken from this claim.

The matter was referred to Commissioner Herbert G. Immenhausen, who filed a detailed report in said cause.

At the meeting of the Court of Claims in April, the Commissioner and the Assistant Attorney General for the State of Illinois, who tried the case, advised the Court that claimant had proven its case by a preponderance of the evidence, and that the objections of respondent, heretofore filed, were not well taken, and would not be urged, as provided for in the order dismissing the motion to strike the complaint in part. It is to be further noted that respondent did not offer any testimony at the hearing, but merely submitted a Departmental Report.

The Commissioner's report carefully analyzed all exhibits and testimony offered in evidence, and the Commissioner's report in the following words and fignres is, therefore, adopted by the Court. It reads as follows:

### "Commissioner's Report

Divane Bros. Electric Company, A Corporation, by Fleck and Pollack, its attorneys, filed a complaint with the Court of Claims on May 26, 1954.

Claimant alleges that on or about February 21, 1950, it entered into a written contract with the State of Illinois, acting by and through the Department of Public Works and Buildings, for electrical wiring of the new power plant at the Illinois State Penitentiary, Pontiac Branch, Pontiac, Illinois, contract No. 66282. Copy attached to the complaint.

Subsequent to the awarding of the contract, and after that work was commenced, additional and extra work was ordered by and through the

Department of Public Works and Buildings, which work was not included in the original contract, and, which it was agreed between the parties should be paid for in addition to matters set forth in the original contract.

On September 30, 1952, claimant forwarded to respondent, through the Department of Public Works and Buildings, 24 proposals for acceptance, which itemized the extra work, and totalled $10,831.98.

On December 15, 1952, respondent recommended that claimant be paid for, in addition to the amounts in the contract, the following work under proposals, 1, 3, 4, 5, 6, 10, 12, 13, 15, 14, 20, 16, 21, 23 and 24, a total amount of $8,380.45; and respondent did on December 15, 1952 request of M. F. Seyfrit, Director of the Department of Public Safety, a requisition to cover the said amount and authority to accept the proposals as an addition to contract No. 66282.

The contract was figured, and the amount to be charged thereunder was computed upon the anticipation that the time for the completion of the contract and work done thereunder would be *180 days*, which was the time specified by the General Contractor for completion of the entire building, but that, due to delays and circumstances entirely out of the control of claimant, the work on the wiring project could not be started for a period of 90 days after the awarding of the contract. Respondent ordered the electrical switchboard directly from the manufacturer, and the delivery of said switchboard, upon which much of the work of claimant depended, was delayed, because of changes made in the layout by respondent as late as May 25, 1951, or a period of 15 months after the work on this project was started by claimant. Although the switchboard had been scheduled for delivery on October 1, 1951, it was not actually delivered until March 25, 1952.

Because of the delays, as set forth above, claimant was subjected to extensive labor and material increases, lost time, and necessarily was subjected to much supervision and overhead expense for the extended period. Claimant did on May 22, 1952, before the completion of its work under contract No. 66282, notify respondent of the following additional costs to claimant as a result of the delays:

| | |
|---|---:|
| Labor increases and insurance | $ 4,092.00 |
| Material increases | 1,265.00 |
| Lost time—832 hours | 2,496.00 |
| Supervision—12 months | 1,200.00 |
| Gen'l. Supt's. time—25 trips | 1,250.00 |
| Overhead expense for extended period | 1,200.00 |

$11,503.00

Claimant discussed the matter of payment of its claim with respondent, through the Division of Architecture and Engineering, on March 17, 1953, and at various other times, but no definite action was ever taken regarding the same.

The following is an accurate account of the amount due to claimant, and moneys paid by respondent, and the balance remaining unpaid on account of work done in connection with the State of Illinois Penitentiary, Pontiac Branch, Pontiac, Illinois, power house electrical wiring:

As per contract No. 66282 made and entered into on February
21, 1950 _____$ 41,830.00

Additional work performed pursuant to the request of respondent,
as set forth in 24 proposals to respondent_____$ 10,831.98

Cost of delays_____$ 11,503.00

$ 64,164.98

Credit allowed respondent by claimant on account of elimination
of lightning protection_____$ 5,000.00

Total amount due claimant_____$ 59,164.98

Respondent paid to claimant to September 24, 1953 on account
thereof _____$ 35,400.75

Balance due September 24, 1953_____$ 23,764.23

On September 24, 1953, claimant received a check in the sum of
$1,429.25 from respondent, which claimant has not cashed, because of the
dispute concerning the amount due, but which check claimant still has in its
possession, but claimed the balance due should be $22,334.98.

In Count Two of said complaint, claimant entered into a written contract
with respondent, State of Illinois, acting by and through the Department
of Public Work and Buildings, on March 27, 1950 for electrical work—altera-
tions to the inmates kitchen (north cell house), Illinois State Penitentiary,
Pontiac Branch, Pontiac, Illinois, as set forth in said contract No. 66308.

Subsequent to the awarding of said contract, respondent ordered certain
extras over and above the work provided for in the original contract. One of
the extras so ordered was in the sum of $3,913.00, about which no dispute
existed, and which was paid by respondent. Certain other additional and
extra work was made necessary by using dropped ceilings not originally
planned, and this required extending 36 ceiling outlets, 6 junction boxes, and
approximately 22 L.B. unilets around beams, as follows:

Material—64 units @ $1.00 ea._____$ 64.00
Labor—64 units (1½ hours ea.)—96 hrs. @ $3.20 per hr._____ 307.20
Insurance on labor_____ 30.72

$ 401.92
Supervision—4 hrs. @ $4.50_____ 18.00

419.92
Overhead—15% _____ 62.99

$ 482.91
Profit—10% _____ 48.29

$ 531.20

Contract No. 66308 was figured, and the amount to be charged thereunder was computed on the agreement that the work could be commenced immediately and completed within a reasonable time, as was specified in the plans of the General Contractor, but, due to the delays and circumstances entirely out of the control of claimant, the work on the alterations to the inmates kitchen (north cell house), Illinois State Penitentiary, Pontiac, Illinois, could not be started until *February 14, 1951, approximately one year after March 27, 1950,* when the contract was awarded. This delay was occasioned by the refusal of respondent to permit the General Contractor to proceed with his work, because of the fact that some equipment had to be removed from the premises, and other work was to be done by institution labor, although during the period of delay claimant necessarily had supervision on the premises and bi-monthly supervision from its main office. Before commencing on the work under the said contract, claimant notified respondent, through the Department of Public Works and Buildings, on February 14, 1951, that, because of *the delay of one year in commencing its work, it would expect to be reimbursed for cost of increases in material and labor, and for cost of supervision.*

Completion of the work under said contract by claimant was further delayed by respondent, because of changes made by respondent in its layout of a certain switchgear ordered by respondent directly from the manufacturer, which switchgear was essential to the completion of claimant's work on the project, and, which, although it had been promised for delivery on October 1, 1951, was not delivered until March 25, 1952. The additional cost of claimant for overhead expense, lost time due to building not being ready for claimant's installation, as above set forth, is as follows:

| | |
|---|---:|
| Labor increases and insurance | $1,870.00 |
| Material increases | 600.00 |
| Lost time—624 hours | 1,872.00 |
| Supervision | 450.00 |
| Overhead expenses for extended period | 900.00 |
| | $5,692.00 |

Because of the delay in delivery of the switchgear equipment, it was necessary for claimant to install temporary alternating current service for a portion of the building equipment from stand-by service in the power house, and the cost of this was $38.00.

Claimant notified respondent of its claim on various occasions in writing, and discussed the claim with respondent, through the Department of Public Works and Buildings, Division of Architecture and Engineering, on March 17, 1953 and June 1, 1953, but no definite action was taken.

The following is an accurate account of the amounts due to claimant and moneys paid out by respondent, and the balance remaining unpaid on account of work done in connection with inmates kitchen, (north cell house), Illinois State Penitentiary, Pontiac Branch, Pontiac, Illinois:

As per contract No. 66308 made and entered into March
27, 1950 _____$ 18,680.00
Extras ordered about which no dispute exist_____$ 3,913.00
Additional work made necessary by lowering of ceilings_____ 531.20
Temporary A. C. Service_____ 38.00
Cost of delays_____ 5,692.00

Total amount due claimant_____$ 28,854.20

Respondent paid to claimant to October 8, 1953 on account
thereof _____ 21,945.81

Balance due claimant on October 8, 1953_____$ 6,908.39

Respondent, State of Illinois, did not file an answer to the above complaint. On January 31, 1956, respondent filed a motion to strike and dismiss the complaint in part. On January 31, 1956, claimant filed objections to the motion of respondent to strike and dismiss. On February 28, 1956, Chief Justice Joseph J. Tolson entered an order denying the motion to strike the complaint in part, but without prejudice to raise all such objections at the hearing of said cause. No such motion was made at the hearing, and respondent did not file an answer, so that a general traverse or denial of the facts set forth in the complaint results.

The trial was commenced on February 28, 1957 by your Commissioner in Room 827, 160 N. LaSalle Street, Chicago, Illinois. Respondent filed a Departmental Report on Counts One and Two as repondent's exhibit No. 1. The Departmental Report was made a part of the record, and was filed with the Court of Claims on April 17, 1957.

It was stipulated by and between counsel for claimant and the State of llinois that the state entered into contract No. 66282 on February 21, 1950 covering certain electrical work to be performed at the Pontiac Prison for the agreed amount of $41,830.00, and another contract No. 66308 on March 27, 1950 for electrical work and alterations in inmates kitchen of the Pontiac Prison for the agreed amount of $18,680.00. The contract or specifications do not call for a completion date, but the project dragged along from the award of the contract in February of 1950 until June of 1952, due to no fault of complainant. The delay of two years and three months was caused by the uncompleted work of the General Contractor, and failure by respondent to furnish and deliver the switchgear until March 10, 1952.

To substantiate its claim, claimant produced four witnesses, and called J. N. Gaunt, Chief of Construction of the State of Illinois, Department of Public Works and Buildings, Division of Architecture and Engineering, during the period of 1950, 1951 and 1952, the period during which work pursuant to the contract was being done, as an adverse witness.

Claimant's witnesses were William Divane, present President of Divane Bros. Electric Co., A Corporation, and the Secretary of said Corporation at the time the work was being done under the contract. The said witness testified that he was familiar with the contract, the contemplated completion

time, the work done under the contract, the extras which were ordered, and conferences which were held on the said extras, the delays, the reason for the delays, and the increases in cost due to wage increases, and increases in costs of material during the delay period. There was testimony from this witness, which substantiated the complaint. Claimant also produced one Rose Smith, one Chester Pazdziaro and one Jerome Buklas. Rose Smith is the bookkeeper for claimant, and she identified cost sheets, books and records of the company kept under her supervision, which books and records were introduced into evidence. In the books and records were payroll sheets showing wage increases, which were paid from time to time during the completion of the contract, and also records as to material purchased. Chester Pazdziaro, one of the witnesses, who no longer is employed by claimant, but was employed during a portion of the period in question, testified that he was a cost clerk and identified the books and records of claimant, which were later introduced as evidence. Jerome Buklas, another witness, testified that he is a buyer and expediter for claimant, and was a cost and pricing clerk during the period in question. He also identified books and records of the company, which were later introduced and put into evidence. The testimony of claimant's witnesses substantiated claimant's claim. The testimony of J. N. Gaunt, called as an adverse witness by claimant, was that during the years 1950, 1951, and 1952 he was a field supervisor of building construction of 67 counties in the State of Illinois. As a part of his job he visited various places where construction was in progress, and made supervisory trips in that capacity to the State Penitentiary in Pontiac, Illinois, which was the subject of the architectural work under the contracts in question; that the General Contractor was the R. V. Monahan Construction Company; and that, while he did not have the contract before him, the contemplated completion time, in his imagination, would be six months; that there was a specification plan for the inmates kitchen prepared by his office; that in that plan was a section relating to delays called the proposal sheet with the estimated completion time of contracts entered into pursuant to specifications; that the general construction would be dependent upon the completion of the general or written contract, and that 95% of all state contracts are completed within 30 days prior to the estimated completion date, and a maximum of 30 days after the completion date is specified; that the contractor or sub-contractor before he could action a delay must receive approval from the state or the architect; *that it was not possible for claimant to install the wiring in the new power house before it was completed, nor was it possible for claimant to complete its work before the installation of the switchgear.* 'The switchgear', which he stated, 'is an intrical part, the same as a light switch would be in residential construction. The switchgear is the control cabinet. Without that, you cannot connect the wiring to or from the gear.' The switchgear was delivered in 1952; and the state bought it on a separate contract from the Roller Smith Company. It was delivered in the first quarter of 1952, *approximately two years after the awarding of the original contract to claimant;* that when the switchgear was actually delivered it had an additional panel for future service added to it for installation, which additional panel was not a part of

the original contract; the reason for the delay in getting the switchgear was not known to him, other than the inability of the manufacturer to manufacture and supply it due to steel shortages, material shortages and so forth; *that there were no references in the specifications to cause claimant to anticipate delay when the contracts were entered into,* because bids for the switchgear were taken on the same date as bids on the electrical work, and were taken on the assumption that the state could get delivery of the switchgear at the proper time to complete the project. Further delay was occasioned by the delay in filling in grade elevations with the excavations for the tunnel, a portion of which was being dug by prison labor, and that claimant could not start on its work until the filling had been completed; that to his knowledge claimant was equipped to proceed with this work immediately after receiving the direction from the state, because they had not asked for an extension of time, and that there was nothing, which would have prevented claimant from completing this contract within the normal completion time of 180 days. *In his capacity as supervisor of construction, he had seen extras or extra work done other than the original work called for in the contract;* that the normal procedure for ordering extras is by letter, a direct authorization by letter from the supervising architect, and that this is altered quite often by field conditions. Where it is necessary to complete the project or a section of the project, and decisions have to be made in the field immediately, in the particular contract there was an associate architect, and that there are employees other than those of his department, who made plans and specifications; *that decisions were made in conference* with the management of the institution, and that the paper work followed; that it takes from 30 to 45 days for the paper work to come through, and it is sometimes 45 days before the contractor gets an order to proceed, and the work is already completed; *that this procedure was adopted for expedition and economical construction of necessity;* that it would cost the state a lot more money, and the state would not be able to complete the projects with the expediency that is desired, and in most cases necessary, if work were not allowed to proceed until an authorization had been delivered. It would be impossible to complete the project, if you had to stop and wait for authorization; *that Mr. Walter Wehrwein was in charge of construction at Pontiac, and had authority to order extras; that he was present at a conference between Mr. Wehrwein and Mr. Divane at which extras were discussed;* that Mr. Wehrwein called him with reference to installation of motors; that the department's electrical engineer was on the job; a representative of the Associate Architects and a representative of the institution were in conference, and it was necessary to make some immediate changes to be able to house some of the prisoners during the course of construction; that he was not able to do so, so he ordered claimant to proceed, but one of four or five people could have so advised him, and it was with the knowledge of Mr. Wehrwein that the 25 proposals for extras, as revised, were recommended or agreed to by Mr. Gaunt's department with the exception of one, which was recommended by bid by someone else, so that for that proposal claimant is making no claim in this case, and that the full amount of the extras as recommended or agreed to by Mr. Gaunt's department was $10,831.98.

Mr. Gaunt further testified that the supervisory work and the portion of the claim by claimant before the actual completion of the contract was authorized by the state for reasons of economy. The maintenance consists of a control of voltage in turning off and on the power at certain intervals of the day, which was done manually before the installation of time clocks and regulatory equipment, and, if claimant had not agreed to do this work at the price claimed, it would have been necessary for the state to hear their proposal, and to put them on a 24 hour operation basis every day, and that for reasons of economy, while employees of claimant were on the job. it would use men interchangeably at maintenance and equipment, who were paid at the rate of 2 hours a day; and that, while the witness was actually not at the conference when this was authorized, he stated he would see that claimant was contracted to do the work by someone with ample authority.

It took claimant two years or longer to do the work in the contracts in question, and he was aware of the long lapse between the awarding of the contract and the completion of the work, because he was the one who was trying to get delivery of the switchgear, and that he also would say without reservation that union wages between 1950 and 1952 were raised on 3 or 4 different occasions, and that the cost of material and equipment also increased generally during that time.

After careful consideration of all of the evidence, and having had an opportunity to observe the witnesses on the stand, their demeanor while on the witness stand, and having examined all the exhibits, it is my opinion that claimant has proved its case by a preponderance of the evidence, and that there is due and owing to claimant in Count One, the sum of $23,764.23, provided that the check in the sum of $1,429.25, which claimant did receive from the State of Illinois and still has in its possession, is returned; and, there is due and owing to claimant on Count Two of said complaint the sum of $6,908.39, making a grand total of the sum of $30,672.62. I, therefore, recommend that the claim be allowed in the sum of $30,672.62.

> *Respectfully submitted,*
> HERBERT G. IMMENHAUSEN,
> *Commissioner.*"

An award is, therefore, made to claimant in the amount of $30,672.62.