Per Curiam.

(No. 5427—

Harrison F. Blades, Inc., Claimant, *vs.* State of Illinois, Department of Public Works and Buildings, Respondent.

*Opinion filed March 12, 1975.*

Samuels, Miller, Schroeder, Jackson & Sly, Attorneys for Claimant.

William J. Scott, Attorney General; William E. Webber and Lee Martin, Assistant Attorneys General, for Respondent.

Burks, J.

The claimant, Harrison F. Blades, Inc., an electrical

contractor, seeks damages in the amount of $50,600.00 by reason of the refusal of respondent's Department of Public Works and Buildings to make final additional payments to claimant for sums allegedly due and owing under a contract claimant entered into with the respondent, and for extra work allegedly performed by claimant thereunder at respondent's direction.

Claimant was awarded the prime electrical contract for the construction of the Warren C. Murray Children's Center at Centralia. The agreement is identified as Contract No. 72100, dated January 3, 1962, by the Division of Architecture and Engineering of the Department of Public Works and Buildings.

The original contract sum to be paid by the respondent to the claimant was $948,986.00. During the performance of the contract, change orders were issued by the respondent adding and deleting certain items. The net result of the change orders increased the total contract sum to $1,125,882.27. Payments have been made to the claimant in the amount of $1,111,885.27, leaving a balance due and owing of $13,997.07. This amount represents a customary retainage of 1.24%. The amount of $13,997.07 is not in dispute and will be included in the award.

In addition to the change orders, claimant allegedly furnished additional labor and materials at the request and direction of the respondent, consisting of the 17 items listed in ¶5 of the complaint and itemized as parts (a) through (q) of ¶5. Claimant contends that these 17 items have a total value of $19,676.53. Of these 17 items, 5 were accepted by respondent's stipulation and one was subsequently approved by the respondent in the amounts claimed. The items which are not in dispute are contained in ¶5 (a) (b) (e) (g) (k) and (q) and have a total

value of $1,000.42. We list these approved items as follows:

(a) Furnished and installed one 110 volt outlet in mechanical building for use by the telephone company; value of labor and material ................................. $ 21.81

(b) Installed seven 100 ampere circuit breakers furnished by other contractors in the seven ward building penthouses; value of labor ................................. 134.42

(e) Additional labor and material furnished in the community building to add to outlets, move a three-gang switch, wire cash register and moving conduit due to late awarding of kitchen equipment contract; having a value of .......... 290.19

(g) Additional labor and material to revise stage curtain control in community building due to a change from a floor mounted to a wall mounted motor; of a value of ......... 48.41

(k) Additional labor and material to move switch-boxes at doors of rooms 118, 138 and 166 in ward buildings 1, 2, 3 and 4; of a value of ............................ $171.83

(q) Labor and material to connect one additional unit heater in each ward building at the loading dock area; value of labor and material ................................ 333.76

The above 6 items claimed in ¶5 of the complaint will be included in the award in the amounts stated totaling $1,000.42. This leaves 11 items which are in partial or total dispute. The further amount of $16,927.00 claimed in ¶6 of the complaint is entirely disputed by the respondent.

The evidence taken on all of the disputed claims was extensive; the record, abstracts and briefs are lengthy. We will deal with each item in dispute as briefly and summarily as possible in stating our findings and conclusions without commenting on the numerous authorities cited by the parties in their briefs or quoting the specific language of the contract unless it seems essential to do so.

5(c) Claims $4,747.68 for "Labor and material necessary to change the size and location of conduit and cable from manholes to low voltage entrance panels on each of seven ward buildings".

This item 5(c) is totally disputed by the respondent. Conceding that there was an error in the plans [Sheet SE-5] as to the size of the conduits required, respondent contends that the correct sizes are shown in certain contract drawings; that the contractor was required to coordinate his work with that of others involved in the project; and that he cannot take advantage of any error or omission in the drawings, etc., as stated in Art. 1077 of the Specifications.

The court finds that the facts in the record support claimant's position. The drawings and plans for the project [Claimant's Exhibit 3] show on sheet SE-1 an electrical low voltage duct run entitled "EL-8" running from the manhole outside of each of the seven ward buildings to the foundation line of each of the buildings. Sheet SE-4 shows that the duct run entitled "EL-8" is composed of 6 two-inch conduits and 2 four-inch conduits.

Sheet SE-5 shows the entrance panel inside each of the ward buildings, but shows *only* 6 two-inch conduits coming into the entrance box. Nowhere in the plans are the 2 four-inch conduits referred to after extension to the foundation lines of the building as shown on sheet SE-1.

Claimant brought this matter to the attention of respondent, and respondent directed claimant to extend the 2 four-inch conduits from the foundation line of each of the buildings, some twenty to thirty feet, through an unexcavated area to the entrance box in the basement of each of the buildings. Claimant, in complying with this direction of respondent, had to install additional ductwork, cable, and concrete encasement.

Admittedly, sheet SE-5 was prepared in error by respondent, and it omitted the 2 four-inch conduits. Mr.

Roy Beers, respondent's inspector on the project, when asked why the 2 four-inch conduits were not shown on sheet SE-5, stated, "You'll have to ask them [the architects], I don't know."

Respondent disclaims responsibility for this error by pointing to Article 1077 of the specifications which states that "a contractor will not be allowed to take advantage of any error or omission in the drawings, etc.". The record shows that the claimant did not take advantage of the error, but brought it to the attention of respondent as soon as the error was discovered.

Every contractor must rely on the plans given to him by an owner in order to calculate his bid for the price at which he will perform a contract. Claimant undoubtedly relied on the plans in arriving at his bid in this case, and subsequently was directed by respondent to provide extra materials and labor not indicated on the plans.

Article 1077 of the specifications, if strictly applied, could lead to unconscionable results. Mistakes by the state could cost a helpless contractor many thousands of dollars. The court has held that the state will not be unjustly enriched to the detriment of another. *Standard Consessions, Inc.* v. *State, 22 C.C.R. 562.* If Article 1077 were strictly applied, an unjust enrichment will result. The respondent made the error in the present case, and claimant is entitled to be compensated for the additional cost resulting from this error.

The cost of the labor and material involved in claim under 5(c), unrefuted in respondent's testimony, was: material $1,627.92; labor $2,125.20; overhead charge $562.96; and ten percent profit charge $431.60. Total amount to be included in the award under 5(c) is $4,747.68.

5(d) Claims $1,230.63 for "Extra labor and material required to relocate low voltage duct run to hospital building due to lack of space inside of hospital building for both high voltage and low voltage entrances in the areas shown on the plan."

This item is totally disputed by the respondent, and the court agrees with the respondent's position.

Claimant bases this claim on the allegation that, because coordination drawings were not prepared for claimant's use prior to the work actually being done, claimant partially installed some low voltage duct runs and then, because of congestion with other contractors, had to move them 20 feet in an easterly direction.

We find that claimant's own testimony shows that he failed to furnish his Shop Drawings to the supervising architect or his representative for their use in preparing coordinating drawings. Claimant was thus in violation of Articles 4, 38 and 1078. The absence of coordinated drawings, of which he complains, was due to claimant's own failure to cooperate in their preparation.

The contract makes it incumbent upon each contractor, especially in congested areas, to obtain these coordinated drawings *before* proceeding to install work that may conflict with other contractors and lead to the possibility of having the work removed and redone.

Claimant also contends that this alleged extra work was done because of a lack of space inside the hospital building for both high voltage and low voltage entrances. We need not belabor this point since claimant did not receive a "change order" to change the location of the low voltage duct. Such an order is mandatory under Article 22: "No change shall be made, unless in pursuance of a written order from the supervising architect, stating that the owner has authorized the change and no claim for an

addition to the contract sum shall be valid unless so ordered." The claim made in ¶5(d) will be denied.

> 5(f) Claims $918.90 for "Labor and additional material required to remove and re-route electrical conduits under the stage area in the community building."

This item is contested by the respondent only as to the amount of additional compensation justified.

Respondent admits it directed claimant to re-route certain conduits. The only question is the value of the labor and material involved in making the change. Respondent admits that it offered claimant $286.00 for this extra work and claims that it had an oral agreement with claimant's superintendent to do the work for this amount. Claimant properly objected to respondent's testimony to this effect as being hearsay, and we must reject it for this reason.

Respondent erred in *requiring* claimant to proceed with this work before a change order was properly executed, as required in the specifications, and having no prior agreement as to cost. Had this been done, this problem would not have arisen. What changes were, in fact, made, is purely a question of fact.

There is a paucity of evidence in the record on this point. When asked how many conduits had to be moved, respondent's Mr. Beers stated, "I'd say two and the telephone." Mr. Blades testified that, "There were nine power conduits plus the power feed to the panel box and the telephone conduit" in place at the time the change was ordered.

We believe that the testimony of Harrison Blades was the most creditable evidence submitted, and find the cost of the materials to be $58.00; labor $668.40; fifteen percent overhead $108.96; ten percent profit $83.54 for a

total of $918.90. Claimant will be awarded $918.90 in satisfaction of the claim in 5(f).

> 5(h)   Claims $1,453.76 for "Additional labor and material required in the kitchen area of each of seven ward buildings to add an additional receptacle at the drinking fountain, install larger size circuit breakers and re-route conduit to conform to kitchen equipment installed by other contractors."

Respondent totally rejects this item, and the court agrees that claimant did not support this claim by satisfactory evidence.

Three elements compose the claim in 5(h). First, the additional receptacles at the drinking fountains were not sufficiently proven, and claimant was unable to show the court an extra receptacle in an on-the-site inspection. There was conflicting testimony of two witnesses as to whether the respondent told the claimant to put them where they were marked on the plans. Giving equal credibility to these two witnesses, the claimant has failed to sustain his burden of proof as we said in *Ackley* v. *State, 22 C.C.R. 41.* It follows that we cannot accept claimant's suggestion that the amount claimed in 5(h) be reduced only by one-seventh for the receptical that could not be found in one of the seven buildings.

As to the second element in item (h), larger size circuit breakers, claimant did not adequately demonstrate to the court that the plans called for smaller circuit breakers, but that larger circuit breakers had to be installed.

The last element in item (h), re-routing conduit to conform to kitchen equipment installed by other contractors, was not pursued by argument in claimant's brief. We find no evidence in the record to substantiate this allegation. The claim made in ¶5(h) will be denied.

> 5(i)   Claim $1,933.06 for "Additional labor and material in the hospital building to add electrical outlets and to change locations of outlets

> and switches roughed in prior to determination of requirements for hospital equipment furnished by other contractors."

Originally, this item was only partially contested, but respondent's brief denies any liability on this claim.

Respondent estimated the value of the acceptable extras proposed to be done at $597.61. However, claimant failed to resubmit a proposal on the items tentatively approved. Therefore, he was operating, if he did in fact make any changes, without proper change orders and in violation of the contract. [Article 22] *Supra.* [Quoted under claim 5(d)]

The court does take notice of the fact, that the hospital equipment was not purchased by the respondent until many months after the contract was signed. Although claimant was ordered by the respondent to rough-in outlets and switches for hospital equipment, the specific electrical requirements for such equipment were not known at the time. Mr. Blades testified that, when the equipment arrived, changes were necessary for various items of hospital equipment including "physicial therapy baths, the morgue, and other areas". This testimony conflicts with that of respondent's Mr. Beers. We believe this dispute should be resolved by the following statement from the departmental report which was made a part of the record and reads in pertinent part as follows:

> "The contractor submitted a second proposal for extra work in the Hospital Building, dated December 6, 1965, in the amount of $1,723.55. The Division of Architecture and Engineering, in a letter to this contractor dated March 8, 1966, stated they have reviewed the nineteen items of extra work listed and believed the contractor is entitled to additional compensation for four (4) items and not for the other fifteen (15) items. The contractor has never furnished a revised proposal for these four items. The Division of Architecture and Engineering has estimated the value of these four items as $597.69."

The court accepts the recommendation stated on page 4 and 9 of the departmental report and will award the sum of $597.69 on the claim stated in 5(i)

5(j) Claim of $436.42 for "Extra length stems furnished for light fixtures F-10 and F-27 throughout the project."

Respondent points out that these items were replaced only in the commissary building and not "throughout the project," as stated in the complaint.

The testimony of the claimant does not clearly establish whether the $436.42 was the cost of 30-inch stems or the difference between the cost of 30-inch stems and the 12-inch stems called for in the specifications. Claimant's brief states that the specifications required 12-inch stems and that respondent ordered claimant to install 30-inch stems in order to lower the light fixtures.

The paucity of evidence submitted on this issue includes a conflict in claimant's own testimony, "We checked for the pendant length required before ordering them." . . . "The plan called for 10-inch pendants and that was what we ordered. We ended up putting in 24-inch pendants." . . . "In any event, as stated in the departmental report, the electrical contract specifications in paragraph #2392 require that the electrical contractor shall check the lengths of the lighting fixture pendant stems with the Supervising Architect before ordering. There is no record of this contractor having done this checking."

We find that claimant has failed to prove by a prepondence of the evidence that he is entitled to the amount claimed in 5(j) and this part of the claim will be denied.

5(l) Claim of $192.02 for "Labor to move ceiling light fixture in ward buildings 2, 3 and 4 due to interference by locker doors."

The facts on this issue, confirmed by this court's Commissioner Robert F. Godfrey, in an on-the-site inspection, are as follows:

Claimant installed the ceiling light fixtures as directed in the plans. Thereafter, lockers were installed, the doors of which struck the light fixtures. The doors on the lockers were not indicated on the drawings or plans. Respondent ordered claimant to move the light fixtures, which necessitated changes in the wiring and conduit.

The evidence shows that extra rewiring had to be done, that claimant did the rewiring, and that this claim is justified. It does not appear to the court that this extra expense was due to claimant's failure to coordinate with other contractors, as respondent contends. On this item, claimant will be awarded the sum of $192.02.

5(m) Claim of $1,081.44 for "Labor and materials furnished in the laundry building for installation of extra outlets at each of the shirt folder and pressing machines, extra light fixture in toilet room, additional circuit breaker and circuit on mono-rail and brackets and disconnect switches on all laundry equipment furnished by other contractors."

There are four parts to the claim stated in ¶5(m). First, we find that the "extra outlets at each of the shirt folder and pressing machines" were required under the contract, viz., Article 2241 of the specifications provides that equipment furnished and installed by others shall be completely wired by the electrical contractor. Hence, no extra charge can be approved.

The second part of 5(m) is for an "extra light fixture in a toilet room." Respondent's inspector, Mr. Beers, admitted that the plans called for three lights in the ladies toilet room, and that a fourth light had been installed. Claimant testified that Mr. Beers ordered him to install the extra light, and Mr. Beers denied that he consulted with anyone from claimant's company regarding this extra toilet room light. Mr. Blades admitted that he had no change order for this additional light.

On this individual item, we again have contradictory

testimony, from two equally credible witnesses, coupled with claimant's admission that he failed to obtain a change order as required by the contract. Hence, claimant failed to carry his burden of proof and must be denied recovery of this item.

The third part of 5(m) is for an "additional circuit breaker and circuit on monorail." Claimant contends that sheet LE-1 of the plans shows one circuit serving an air-handling unit and also the monorail, an overhead cranelike affair. In other words, that the plans show a circuit for the two pieces of equipment. Claimant states that this circuit was too small to serve both pieces of equipment, and that respondent ordered claimant to install a separate circuit to serve the monorail.

We find that plan LE-1 calls for circuit #14 for the monorail. Respondent's Mr. Beers denied that the plans called for a washer to be hooked up to the monorail circuit #14. He pointed out to the court, from the plans, that the plan LE-1 shows two circuits, four wires—[circuits 13 and 14]—in the same conduit with a circuit breaker for each circuit and the monorail operating off the circuit 14. Claimant failed to show that he had, in fact, installed an *additional* circuit or circuit breaker on the monorail. The testimony indicates that just two circuits [#13 and #14] were installed, those being the two called for in the plans. This item, part 3 of 5(m) will be denied.

The fourth and final claim in 5(m) is for "brackets and disconnect switches on all laundry equipment furnished by other contractors."

We find that it was claimant's duty under Article 2241 of the contract, to see that this equipment "furnished by other contractors" was completely hooked up,

ready to operate. These laundry machines, and the main control panel, having been placed in such a location as to have the motors out of sight of the main control panel, require a disconnect switch located at the motor (at the back of the machine) before it can be considered to be a complete hook up ready to operate as required by Article 2241. This disconnect switch is a safety factor [required by the National Electrical Code] to protect a workman, who might be in behind the machine working on the motor, from being shocked by someone being unaware of his presence turning on the machine at the front of the machine or by tripping the switch at the main control panel.

Claimant contends that these switches were not necessary for an approved installation under the National Electric Code, since the motor is not out of sight of the main panel board. Claimant testified that the motor is well within sight of the panel board. Respondent does not effectively contradict this evidence. However, claimant does not establish the cost of this element of item 5(m) beyond the cost of eight floor brackets at $36.00. Consequently, a total award of $36.00 will be made under all parts of item 5(m).

> 5(n) Claim of $2,213.93 for "Labor and additional material required to relocate circuits and boxes in dietary building due to purchase of kitchen equipment by respondent having different rough-in requirements from those shown in the plans."

Respondent concedes that it directed claimant to relocate certain circuits and boxes in the dietary building, and that this change was necessary because kitchen equipment was not purchased by respondent until sixteen months after the building construction contracts, including the contract in question, were signed. Respondent admitted the sixteen months delay in purchasing the kitchen equipment. Respondent concedes that

claimant is entitled to an award on this item, but questions the amount.

Claimant submitted its written change order in the amount of $2,213.93 to the respondent and the latter took no action with regard to the change order. Approximately three weeks after the change order was sent to the respondent, the latter directed claimant to begin the work. Thereafter, respondent asked claimant to reduce the labor charge from 284 hours to 160 hours at $5.10 an hour. However, claimant testified his workers spent 284 hours on this extra. This was not refuted by the respondent. We find that an award of $2,213.93 [for material, $301.75; 284 hours of labor at $5.10—total $1,448.40; fifteen percent overhead at $262.52; and ten percent profit at $201.26] should be granted for this extra. An award of $2,213.93 will be made for the claim in 5(n).

5(o)  Claim of $2,914.05 for "Labor and material required to pour additional concrete on bottom of manholes to improve drainage resulting from change of type and location of drains."

This work involved pouring additional concrete on the floors of these manholes so that water in the manholes would drain out. The floor was poured by the claimant through the services of a sub-contractor. The drains were installed when the walls were poured. The result was that the drain was about ¾ of an inch up off the floor. Additional concrete had to be poured on the floor of the manholes to slope the floor to the drain. Claimant admits that the drain, ¾ of an inch off the floor, was apparently an error in judgment. If the drains had been set in place in the floor at the proper level initially, the extra concrete would not have been needed. Claimant bore the responsibility to see that the drain was properly installed, and cannot recover his claim for this extra.

5(p) Claim of $1,554.22 for "Labor and material to install additional cable racks in all low voltage manholes."

This item was only partially contested by the respondent. The present demand is $1,554.22. However, by letter dated December 6, 1965, the contractor agreed to reduce this demand to $1,066.00 according to the departmental report. The dispute is as to the number of feet of additional cable racks actually installed. The racks in the manholes were counted by respondent's Mr. Beers, and he found the number of feet to be 634½ altogether.

Claimant alleges 317¼ feet, and we find this claim supported by the weight of the evidence. Respondent recommends that claimant accept payment on this item of $888.72 which is about $178.00 less than we believe is due the claimant based on 317¼ feet at the unit price of $3.36 per foot which comes to $1,066.00. An award of this amount is made under the claim in item 5(p).

6(a), (b), (c) & (d) Claims $16,927.00 for "The furnishing and installing of 12,750 straps and hangers on concealed conduit."

This $16,972.00 claim is the largest single item claimed in the complaint and the one on which we find the least convincing evidence in support of claimant's position.

The heart of the problem in connection with this claim deals with Section 2193 of the specifications. This section, which is the first section under the "Conduit Supports and Hangers" heading, describes the method for support of conduit "for exposed work on walls and ceilings" as follows:

CONDUITS SUPPORTS AND HANGERS:
2193: For exposed work on walls and ceilings conduits shall be supported every five feet with galvanized case one hold straps, clamp backs and anchors as herein specified.

Claimant argues that because Article 2193 refers to

"exposed work" all the other articles [Arts. 2193 through 2199] refer *only* to exposed work; and that he was free to use another method, i.e., bare wire, to support concealed conduits above the ceiling.

Claimant commenced installing concealed conduit above the suspended ceilings by using bare wire wrapped around the conduits and the ceiling supports in order to support the conduits, but was not permitted to use such method by the respondent. At the direction of the respondent, the claimant agreed to install concealed conduit in the manner provided in the specifications for exposed conduit. Thereafter, the claimant states that he installed 12,750 straps and hangers to support concealed conduits.

Whether claimant did install 12,750 straps and hangers is a question of fact which claimant did not prove by the evidence submitted in the record, nor to the satisfaction of the court in our on-the-site visual inspection.

We deem it unnecessary, therefore, to comment on the numerous pages in the briefs of both parties dealing with the questions: (1) Whether the conduits above the "mechanical" ceilings were "concealed" or were in an "exposed" area because they are accessible; (2) Whether custom and usage in the electrical trade sanctions the use of bare wire to support conduits; and (3) Whether the contract was so ambiguous as to justify the contractor's use of bare wire supports in "concealed" areas, if any.

Having found that the weight of the evidence does not support claimant's allegations as to the extra straps and hangers installed as requested by the respondent, it becomes immaterial as to whether they were required by the contract or by custom and practice in the trade.

The claim for $16,927.00 as stated in the complaint ¶6 (a), (b), (c), and (d) is denied.

A summary of our findings in this multi-count complaint is as follows: [* denotes items not contested by the respondent.]

| Item No. | Amount Claimed | Amount Awarded |
|---|---|---|
| 4 | $13,997.07* | $13,997.07* |
| 5(a) | 21.81* | 21.81* |
| 5(b) | 134.42* | 134.42* |
| 5(c) | 4,747.68 | 4,747.68 |
| 5(d) | 1,230.63 | –0– |
| 5(e) | 290.19* | 290.19* |
| 5(f) | 918.90 | 918.90 |
| 5(g) | 48.41* | 48.41* |
| 5(h) | 1,453.76 | –0– |
| 5(i) | 1,933.06 | 597.69 |
| 5(j) | 436.42 | –0– |
| 5(k) | 171.83* | 171.83* |
| 5(l) | 192.02 | 192.02 |
| 5(m) | 1,081.44 | 36.00 |
| 5(n) | 2,213.93 | 2,213.93 |
| 5(o) | 2,914.05 | –0– |
| 5(p) | 1,554.22 | 1,066.00 |
| 5(q) | 333.76* | 333.76* |
| 6(a) (b) (c) & (d) | 16,927.00 | –0– |
| Totals . . . . . . . . | $50,600.60 | $24,769.71 |

The claimant, Harrison F. Blades, Inc., is hereby awarded as the amount due under its contract for electrical services performed, the sum of $24,769.71.