(No. 5254—

Mass Construction Company, a Delaware Corporation, Claimant, *vs.* State of Illinois, Respondent.

*Opinion filed April 17, 1969.*

Carbary and Carbary and Thomas D. Dopler, Attorneys for Claimant.

William G. Clark, Attorney General; Morton L. Zaslavsky, Assistant Attorney General, for Respondent.

Perlin, C.J.

Claimant, a Delaware Corporation, seeks to recover the sum of $69,454.00 alleged to be due and unpaid under

a contract for the erection of two parallel seven-span bridges on Interstate Route No. 57 over the Little Wabash River in Effingham County, Illinois. The amount requested is for the construction of eight cofferdams (water-tight enclosures from which water is pumped to expose the bottom of a river, and permit work to be done there) at the contract unit price of $8,000.00 each, and for 1,732 cubic yards of cofferdam excavation at the contract unit price of $7.00 per cubic yard.

The project involved the erection of twelve concrete piers to be erected as part of the substructure for the two bridges to support their superstructures. The piers, having the same general structural detail, were designated as follows:

| | | |
|---|---|---|
| Pier No. 1-East | Pier No. 3-East | Pier No. 6-East |
| Pier No. 1-West | Pier No. 3-West | Pier No. 6-West |
| Pier No. 2-East | Pier No. 4-East | Pier No. 5-West |
| Pier No. 2-West | Pier No. 4-West | Pier No. 5-East |

The contract between claimant and respondent was executed on July 1, 1963. Claimant was required to begin work ten days after execution and approval of the contract, and to complete performance prior to August 1, 1964, subject to certain provisions for extensions of time. Claimant's bid was accepted in the amount of $486,454.80.

The evidence shows that at the time the contract was executed claimant and respondent anticipated that cofferdams would be required to be driven in connection with piers No. 3 and 4, which was stated specifically in the contract. Claimant's witness, Walter C. Glaze, an engineer who prepared the bids for claimant, testified that the parties anticipated the possibility that cofferdams would also be required to be driven in connection with the construction of piers Nos. 1, 2, 5, and 6 (both East and West).

The language of the contract pertaining to the coffer-dams and cofferdam excavation is as follows:

"*Cofferdams:* It is anticipated that cofferdams will be required for the construction of piers Nos. 3 and 4 of the bridges. Bid items for these cofferdams are included in the total bill of materials on the plans. . . .

"The contract unit price each for cofferdams at the piers designated will be payment in full for furnishing all materials and the construction of the cofferdams, its maintenance during construction of the pier, and subsequent removal; . . .

"*Cofferdam Excavation:* This work shall consist of all foundation excavation for the piers without classification except rock, within the limits of the cofferdams, and the disposal of all excess material obtained from such excavation as elsewhere specified. . . .

"This work will be paid for at the contract unit price per cubic yard for cofferdam excavation."

The undisputed evidence further shows that construction was begun by claimant during the first week in July, 1963. Excavation for piers Nos. 3, 4 and 6 was commenced. Claimed encountered a "fine, runny, silty sand" at pier No. 6, and tried to carry out the excavation operation by using a crane with digging buckets, but, as fast as it dug, the soil would come in from the sides and both ends of the hole. A point was reached where the approach embankment constructed by another contractor was endangered. Claimant found it impossible to proceed without the construction of cofferdams.

On July 19, 1963, claimant wrote to the District Engineer for respondent as follows:

"In the contract covering the above Section, piers Nos. 3 and 4 of both structures call for cofferdams as payment items. After excavating at pier No. 6, we find that unstable subsoil conditions similar to that of piers Nos. 3 and 4 prevail; that is a running silt condition. At pier No. 5 we presently have an excavation approximately 40 feet wide at the top, and are still unable to get down to the footing elevation. The sides are filling in so badly that it is impossible to proceed on construction without cofferdams. Rather than delay construction and further disturb adjacent subsoil, we are preparing to drive a cofferdam at this location—pier No. 6.

"We are of the opinion the same condition will also prevail at several of the other piers.

"We invite your inspection of the aforementioned conditions, and, if you have any feasible solutions other than using cofferdams, we will cooperate in trying other suggested methods.

"Please let us know your findings as soon as possible."

By letter dated July 22, 1963, the District Engineer, I. C. Bliss, through his agent, Robert M. Gamble, replied:

"Replying to paragraph three of your letter, dated July 19, 1963, this is to inform you that an inspection has been made of the excavation for pier No. 6, and *it appears that your only solution is to use sheeting or cofferdam.* (Emphasis supplied)

"The plans and special provisions require payment for a cofferdam for piers Nos. 3 and 4 of both bridges. No cofferdam is required on the remaining piers, and no payment can be made if you decide to use cofferdams on these piers. The borings on the plans show that even though piers Nos. 1, 2, 5, and 6 are approximately 13 feet higher than piers Nos. 3 and 4, the excavation is well in waterbearing sandy loam, which would indicate that sheeting of some type would be required. . . ."

Mr. Herman Mass, president of Mass Construction Company, testified that upon receiving the letter he decided to proceed under protest. He further testified that he did not agree with the conclusion of the District Engineer that no payment would be made for cofferdams at piers Nos. 1, 2, 5 and 6, although they were necessary, because the plans and proposal state that they only estimate the amount of cofferdams, which may be required. Mr. Mass stated that he protested the conclusion, but decided to proceed because of the time limit and penalty clause for noncompletion.

Mr. Gamble, the only witness presented for respondent, testified that it would have been impractical to have constructed the bridge without the cofferdams, although he further stated that he did not make any recommendations to the State that they re-negotiate for new cofferdams on the balance of the piers.

A letter from claimant to Mr. Virden E. Staff, Chief Highway Engineer, Department of Public Works and Buildings, which was admitted into evidence without objection, summarizes claimant's position in the instant proceedings, and states in part:

## II

"In its Proposal to the Department, which was incorporated into the Contract, the Contractor was required to give the following assurances to the Department:

6. The undersigned declares that he understands that the *quantities mentioned are approximate only, and that they are subject to increase or decrease; that he will take in full payment therfor the amount of the summation of the actual quantities, as finally determined, multiplied by the unit prices shown in the schedule of prices contained herein.* (Underscoring supplied)

8. The undersigned further agrees that, if the Engineer decides to extend or shorten the improvement, or otherwise alter it by additions or deductions, including the elimination of any one or more of the items, *he will perform the work as altered, increased or decreased, at the contract unit prices.*" (Underscoring supplied)

## III

"The Contract Schedule of Prices for work to be performed provides in part:

| Item Number | Pay Item Description | Quantity | Unit of Measure | Unit Price | Total Price |
|---|---|---|---|---|---|
| 050004 | Cofferdams | 4.00 | EACH | 8,000.00 | 32,000.00 |
| 050005 | Cofferdam Excavation | 1,800.00 | CU YD | 7.00 | 12,600.00 |

. . . ."

## VI

"Provisions of the Contract Specifications pertinent to the issue between the District Engineer and the Contractor are:

4.1 INTENT OF THE PLANS AND SPECIFICATIONS. The intent of the plans and the specifications is to prescribe a complete outline of work, which the Contractor undertakes to do in full compliance with the contract. The Contractor shall . . . construct all . . . structures, and such additional, extra, and incidental construction as may be necessary to complete the work . . . in a substantial and acceptable manner.

4.3 ALTERATIONS, CANCELLATIONS, EXTENSIONS, AND DEDUCTIONS.

...... "Should such changes in the plans result in an increase or decrease in the quantities of the work to be performed, the Contractor shall accept payment as follows:

(a) All such work as appears in the contract as specific items accompanied by unit prices shall . . . be paid for at the contract unit prices."

...

"Thereafter during the months of August, September, October, and November, 1963, work on piers Nos. 1, 2, 5, and 6 proceeded, and at each pier a cofferdam with the necessary excavation had to be erected and carried out in order to complete construction. At all times performance was under the constant inspection of the District Engineer and his forces. There was never any difference or dispute between the forces of the Contractor and the District Engineer over the question that the cofferdams and excavation therefor were absolutely necessary and essential as the only solution to provide for erection of *all* piers at the two bridges."

### The Issues

"During and after completion of the project the Contractor demanded payment for performance of cofferdam excavation and the erection of cofferdams, required as the only solution at piers Nos. 1, 2, 5, and 6, according to the unit prices fixed for these items in the Contract Schedule of Prices, i.e., $8,000.00 each for the eight additional cofferdams, and $7.00 per cubic yard for the cofferdam excavation.

"Over the repeated protests of the Contractor, the District Engineer took the position that, despite the requirement for cofferdams to making possible the completion of work at all piers, he had no authority to pay for either the cofferdams or the excavation in connection therewith other than for that done at piers Nos. 3 and 4."

Respondent's main contention deals with the following provision in the "Standard Specifications for Road and Bridge Construction":

"9.4 PAYMENT FOR EXTRA WORK. Extra work, which results from any of the changes as specified in Article 4.3, shall not be started until receipt of a written authorization or work order from the Engineer, which authorization shall state the items of work to be performed, and the method of payment for each item. Work performed without such order will not be paid for."

Respondent argues that the District Engineer did not give the required authorization; that claimant was warned that it would not be paid; and, that an engineer in charge of public construction work has no authority to modify a stipulation requiring a written order for alterations or extras.

Paragraph 4.3 quoted above, to which 9.4 refers also, states that a supplemental agreement will be required when such changes involve a net increase or a net decrease in the amount of the contract of more than 25% of the original contract price. However, the provisions of the specifications, which are most directly in point, may be found in paragraph 2.2 as follows:

"2.2 INTERPRETATION OF ESTIMATE OF QUANTITIES. An estimate of quantities of work to be done and materials to be furnished under the specifications is given in the proposal. It is the result of careful calculations, and is believed to be correct, but it is given only as a basis for comparison of proposals and the award of the contract. The Department does not expressly or by implication agree that the actual quantities involved will correspond exactly therewith; nor shall the bidder plead misunderstanding or deception because of such estimate of quantities, or of the character, location, or other conditions pertaining to the work.

*"Payment will be based on the actual quantities of work performed in accordance with the contract, at the contract unit prices specified.* No allowance will be made for any change in anticipated profits due to an increase or decrease in the original estimate of quantities. . . ." (Emphasis supplied)

In the case of *Chism, Inc.,* vs. *State of Illinois,* No. 5313, which also involved interpretations of the above sections of the "Standard Specifications for Road and Bridge Construction", this Court held that claimant is not limited to the amount specified by the contract. The Court further stated that Section 9.3 of the Specifications provide that "if unit price bids are requested by the State, the contractor is to be paid for actual amounts

419

used whether it be more or less than the total estimated by the State on the Schedule of Prices."

In the instant case, the bid sheet called for bids on four cofferdams and on 1,800.00 cubic yards of cofferdam excavation. Claimant bid $8,000 per cofferdam and $7.00 per cubic yard of excavation. Claimant was not asked nor given the opportunity to bid on any other quantities than those specified. Therefore, respondent's contention that claimant should have realized the need for the additional cofferdams, and should have so provided in its bid, must be rejected.

Respondent submitted no evidence to show that the cofferdams constituted "extra work", and were not included within the scope of the original contract. The requirement of a supplemental agreement where the variation is more than 25% of the original contract price is not applicable in the instant case.

Claimant is entitled to $64,000.00 for eight additional cofferdams at the unit price of $8,000.00 each, and $5,454.00 for additional cofferdam excavation. Claimant is hereby awarded the sum of $69,454.00.