(No. 86-CC-0017—)

EVANS CONSTRUCTION Co., Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Order filed June 17, 1988.*
*Order filed August 12, 1991.*

SORLING, NORTHUP, HANNA, CULLEN & COCHRAN, for Claimant.

NEIL F. HARTIGAN and ROLAND W. BURRIS, Attorneys General (G. MICHAEL TAYLOR and THOMAS S. GRAY, Assistant Attorneys General, of counsel), for Respondent.

## ORDER

Montana, C.J.

## I.
## INTRODUCTION

Claimant, Evans Construction Company, brought this action on behalf of its subcontractor and itself seeking compensation for work performed in connection with the rehabilitation of an underground State parking lot. The record is quite extensive and the Court commends the parties for efforts in presenting this complex case in such a clear and concise manner.

## A.
## GENERAL BACKGROUND

On April 12, 1983, Evans Construction Company ("Evans") and the Capital Development Board for the State of Illinois ("CDB") entered into a unit price contract for the rehabilitation of a two-level underground Old State Capitol Parking Garage at Springfield, Illinois. The user of the facility is the Illinois State Historical Society. This · project officially started in

September 1980 when Hanson Engineers, Inc. ("Hanson"), of Springfield was selected as the architectural/engineering firm. Hanson was involved in the original design of this structure and had performed additional rehabilitation work at the Old State Capitol and the garage in prior years. Funds were released in December of 1981 and bid documents were frozen at the 100% stage in March 1982. Almost one year later (January 1983) construction funds were released and bid documents issued. Bids were received on April 6, 1983; Evans was the lowest of five bidders with a bid of $704,000.00.

## B.
## THE COMPLAINT — 10 COUNTS
### COUNT I
### (RETAINAGE)

Count I deals with the sum of money yet retained by CDB, $75,941.60, and admitted to be owed to Evans (paragraph 66 of additional stipulation of fact). This sum also compensates Claimant for the sums requested under Count II.

### COUNT II
### (ACCOUNT STATED)

Count II is an action on an account stated theory, based on a CDB form commonly referred to as a RFP, Request for Proposal. This form is Exhibit B affixed to the complaint and referenced in Count II. In part it states:

"2. REQUEST for change by : CDB
CDB contemplates making certain changes, additions and deletions to the work to be performed under the subject Contract. Unless otherwise indicated in the description of the change, accompanying drawings and specifications all work required shall conform to the contract documents. The Contractor is requested to submit within 14 calendar days from the date herein a proposal and a detailed breakdown for this change. The proposal shall be submitted in accordance with CDB's format and the general conditions.

3. REASON for change:
 Adjustment to contract based on measured quantities.
4. DESCRIPTION of change including reference to drawings and specifications revised, new drawings and specifications issued.
 (See Attached Sheet)"

The attached sheet referenced above was a May 8, 1984, summary of quantities which listed 10 items. It would appear that this RFP was a final attempt by the parties to resolve their differences short of this litigation. The summary of quantities is worth noting because it serves as a summary of all matters involved in this suit. It is set out as follows: [See page 116 following.]

Count II was in effect an acceptance by Claimant of CDB's prices and quantities as to items 3, 4, 6, 7, 9 and 10 for a net award to Claimant of $1,147.00 after permitting certain other adjustments agreed to by Claimant (paragraph 5 of Count II of the complaint).

The parties' inability to come to terms on items 1 and 2, "partial and full depth patching, level L-1," of the two-level underground garage is the sound versus unsound concrete question comprising Counts VI and X of the complaint, and spoken to below.

## COUNT III

## (EPOXY CRACK INJECTION)

Item 5 of the RFP and the summary of quantities illustrates the parties' agreement on the quantity of coverage on the epoxy crack injection, 6,791 lineal feet, column second from the right entitled "Net Change Order Quantities." Claimant, however, refused to abide CDB's suggested unit price of $14.65, which would have resulted in additional compensation to Claimant of $99,488.00, still approximately $50,000.00 shy of what Evans had locked itself into with its subcontractor, Mid-

REHABILITATION OF OLD STATE CAPITOL PARKING GARAGE

CDB 678-010-016

## SUMMARY OF QUANTITIES

May 8, 1984

| Item | Contract Allowance | Final Amount | Bid Unit Prices | Bd. Apprvd. Unit Prices | Net Change Order Quantities | Total Value |
|---|---|---|---|---|---|---|
| 1. Partial Depth Patching (Level L1) | 36,000 S.F. | 14,287 S.F. | $ 7.00 | $—— | 21,713 S.F. | $151,900 |
| 2. Full Depth Patching (Level L1) | 4,000 S.F. | 17,692 S.F. | 10.00 | —— | 13,692 S.F. | 136,920 |
| 3. Partial Depth Patching | 500 | 520 S.F. | 7.00 | —— | 20 S.F. | 140 |
| 4. Full Depth Patching | —— | 14 S.F. | 10.00 | —— | 14 S.F. | 140 |
| 5. Crack Injection | 1,750 L.F. | 8,541 L.F. | —— | 14.65 | 6,791 L.F. | 99,488 |
| 6. Rib Repair | 4,500 L.F. | 4,310 L.F. | 25.00 | —— | -190 L.F. | 4,750 |
| 7. Epoxy Coated Reinforcing Bars | 3,000 Lbs. | 14,127 Lbs. | 1.00 | —— | 11,127 Lbs. | 11,127 |
| 8. Epoxy Coated Welded Wire Fabric | 8,000 Lbs. | 14,929 Lbs. | —— | 1.40 | 6,929 Lbs. | 9,701 |
| 9. Painting (Rib Repair) | 4,500 L.F. | —— | 3.50 | —— | —— | —— |
| 10. Sealing Cracks in Overlay | 2,500 L.F. | —— | 5.00 | —— | —— | —— |
| | | | | TOTAL: | | $100,775 |

Continental, at $22.00 a lineal foot, or $149,402.00, spoken to in more detail below.

Count III is a dispute as to a unit price. The evidence came in by way of a videotaped evidence deposition of Jim Halsey, principal for Mid-Continental, taken on April 9, 1986, and a 64-paragraph joint stipulation of fact filed on August 14, 1986, specifically addressed in paragraphs 1 through 28.

In part, the contract provides "unit prices and material substitutions have been accepted and are incorporated in this contract." The unit prices were incorporated by an attached page. The attached page had unit prices for eight different items of work.

Under the general requirements of the contract, Evans had to "provide unit prices for specified work items" (section 1.01 B). Under subsection C of section 1.01, unit price was defined to mean a "fixed price, including all overhead profit and all other costs of whatever nature and character, for a specified unit of work." CDB had the right nonetheless to "reject or negotiate any unit prices which it considers excessive or unreasonable." In fact, Evans' $704,000.00 bid listed unit prices for eight different aspects of the job. Six of the eight unit prices were accepted by CDB, and became part of the final contract. Two of the eight unit prices Evans submitted were rejected by CDB under its right to "reject or negotiate any unit price which it considers excessive or unreasonable." The unit prices that were rejected were the ones submitted for epoxy coated crack injection, the subject matter of Count III, and epoxy coated welded wire fabric, the subject matter of Count IV. The matter came before this tribunal to determine among other matters the appropriate price for the epoxy coated crack injection actually performed in excess of

the 1,750 feet estimated under the contract, referred to in Count III as "epoxy coated crack injection."

A setting forth of some of the stipulated paragraphs in this regard is helpful. They are as follows:

"3. Under Division 3 of the Project Manual, Concrete, Section 03730, entitled 'Concrete Rehabilitation', Section 3.01.D. appearing at page 03730-11, the following work was to have been performed:

Vertical, through slab cracks in the repair areas shall be repaired by full depth epoxy injection (Pressure (sic) Injected Crack Sealant).

4. The project manual, Division 1-General Requirements, Section 01151, dealing with unit prices, Section 1.01.C. Provides:

Definition: Unit price means a fixed price, including all overhead profit and all other costs of whatever nature and character, for a specified unit of work. Unit prices as such will not be used to determine the lowest responsible bidder. CDB may reject or negotiate any unit prices which it considers excessive or unreasonable. CDB may at any time order an increase or decrease in the number of units of work. Unit prices in the bid form, when incorporated in the Contract by CDB shall be the same for additional or deducted units, except in the case of pilings, where the method of measurement and the basis of payment will be determined as set forth in Articles 513.18 and 513.19 of the 'Standard Specifications for Road and Bridge Construction' as adopted by the Illinois Department of Transportation.

5. Under the Contract aforesaid, there was no unit price assigned to epoxy crack injection.

6. Exhibit 3 is the relevant portion of Standard Documents for Construction effective May 1, 1982, and incorporated into the aforesaid contract, relevant portions read:

VALUE OF CHANGE. If a change affects work covered by unit prices in the Contract, such unit prices shall be used as the basis for adjustments to the contract sum. Except as otherwise specified, in all other cases, adjustments to the contract sum shall be based on the contractor's direct costs, including costs of material, labor, Workmen's Compensation Insurance, equipment bonds and taxes as applicable, plus an amount of 15% for overhead and profit except that no overhead and profit shall be deducted from the price for changes deleting work. If the changed work is performed by a subcontractor, 15% shall be added to that subcontractor's costs for overhead and profit, an additional 5% shall be included for the Contractor's overhead and profit and a further 5% shall be included for each intermediate subcontractor, if any, between the Contractor and the subcontractor, performing the changed work.

7. Under the contract documents, the quantity under which bids were made for lineal feet of epoxy crack injection was 1,750 feet.

8. In actual fact, 8,541 lineal feet were completed pursuant to command of the defendant with an overage thus being 6,791 feet."

On May 2, 1983, nine days after Evans and CDB entered into a unit price contract, which was devoid of an agreed upon unit price for the two items, the subject matter of Counts III and IV, Mid-Continental Restoration Corporation ("Mid-Continental") and Evans entered into a contract, where for the price of $262,892.00, Evans subcontracted a portion of the work under its contract with CDB. Among a part of the subcontract work was the epoxy crack injection. The $262,892.00 figure covered, among other things, work of epoxy crack injection. Further as exhibit 4—5 discloses, Evans and Mid-Continental agreed that the unit price for epoxy coated crack injection, should the final quantities be more or less than 1,750 feet, would be at $22.00 a foot as between Evans and Mid-Continental. Thus, as the work began, Evans had bound itself to pay a subcontractor $22.00 per lineal foot above 1,750 feet for crack injection, while at the same time never having secured an agreed upon unit price between itself and CDB for quantities over 1,750 feet. The fact that Evans was in this situation as of May 2, 1983, would have been of little concern and of no consequence provided the final quantities did not deviate from the 1,750 feet estimated by Hanson; paragraph 7 of the stipulation. Today, as to the epoxy crack injection alone, Evans has obligated itself to pay Mid-Continental $149,402.00 over and above the agreed contract price of $262,892.00. This $149,402.00 figure is arrived at by multiplying the agreed upon overage, 6,791 feet, times the $22.00 that Evans and Mid-Continental had agreed upon.

Paragraphs 10 through 27 of the additional stipulation of fact filed August 14, 1986, simply state the

chronology of the parties' attempts to come together on an agreed upon unit price. The estimating section for CDB did agree to a $23.50 figure for the lineal feet as did Hanson Engineers, Inc. (paragraph 19 of the stipulation). The stipulation itself, together with Halsey's evidence deposition, was the only evidence offered in regard to a proper unit price under the contract documents. The evidence is barren of any support of the $14.65 per lineal foot figure proposed by CDB in May of 1984. Based on the record before us, it is our opinion that a proper following of the contract documents would result in a $22.80 figure per lineal foot for the epoxy crack injection, if allowed at all, or $154,834.80.

## COUNT IV
### (EPOXY COATED WELDED WIRE FABRIC)

The epoxy crack injection, Count III, differs from the epoxy coated welded wire fabric question, Count IV, not at all in theory. The difference in fact is that the epoxy coated welded wire fabric items were not subcontracted by Evans to any third party. Additionally, as it became obvious that there was going to be an overage on the lineal footage for epoxy crack injection, it became equally obvious that there was going to be an overage on the allotted pounds for the epoxy coated welded wire fabric. Thus, the correspondence between the parties invariably dealt with each question simultaneously. The question as to these two items was simply how does one determine the compensation for work ordered to be done by CDB over and above the tentative estimated quantities where neither of the parties incorporated a unit price for such overage, but proceeded to negotiate and eventually reach an agreed upon unit price even while the overages were being ordered on a daily basis by CDB, through its architect/engineer, Hanson?

Nor are the parties in dispute as to the proper amount of an award in Evans' favor if there is to be any award at all as to Count IV, the epoxy coated welded wire fabric, the sum of $16,283.15.

This same joint stipulation of fact dealt with Counts IV and V. Count IV entitled "Epoxy Coated Welded Wire Fabric" (no assigned unit price) is the matter addressed again in the aforementioned summary of quantities as item No. 8. CDB suggested a unit price of $1.40. The joint stipulation of fact discloses, however, the appropriate unit price to be $2.35, which is uncontradicted, and when multiplied by the excess weight of 6,929 pounds, again the figure opposite item 8 under the column "Net Change Order Quantities" would result in an award of $16,283.15 if any award is granted at all (paragraphs 39 through 60 of the joint stipulation of fact).

## COUNT V

Count V, entitled "Request for Reimbursement for Electrical Bills," was not addressed in CDB's RFP. It is addressed in paragraphs 29 through 38 of the August 14, 1986, joint stipulation of fact. Downtown Parking, Inc., leased the garage from the State Historical Society, and agreed to pay for the electrical bills for the necessary lighting. By August of 1983, because CDB had ordered all contractors to work double shifts, the electrical bills had doubled over the normal use. A meeting was held on August 8, 1983, to resolve the legitimate complaints of Downtown Parking, Inc. CDB through James Duda asked Evans to pay all of the electrical bills thereafter which were going to Downtown Parking, Inc., until the second shift was discontinued. Evans agreed and did. CDB through James Duda at the August 8 meeting agreed to reimburse Evans for such payments. It hasn't.

The sum of electrical bill payments by Evans is $16,355.74, the amount due Evans if any award is granted under Count V.

## COUNTS VI THROUGH X
## (SOUND VERSUS UNSOUND CONCRETE)

Turning finally to the sound versus unsound concrete question which again shows up as items 1 and 2 of CDB's May 8, 1984, summary of quantities, the parties are in agreement that the *excavation* of sound concrete was outside the original contract. Evans claims, however, that replacement with good concrete of the concrete that was excavated, irrespective of whether the excavated concrete was sound or unsound, was within the contract in all events. Thus Evans claims that its work in replacing the holes or craters that were left after the excavation of the concrete was yet another item called for under the contract, but for reasons that will be made clear in this discussion, was simply work that had not yet had assigned to it a unit price. The parties are in agreement as to the quantities of both sound and unsound concrete excavated and replaced with good concrete. The State does not, however, agree with Evans' analysis that its replacement with good concrete of the holes and craters left was within the original contract. Evans' theory under Count VI is that it complied with all requirements of the contract in securing the necessary written authorization to be compensated for work done outside of the contract regarding the excavation of the sound concrete. The excavation for the concrete had been subcontracted to Mid-Continental. As to the excavation of the concrete and the questions here encountered, Evans presented the case of its subcontractor for additional compensation through Evans. The State claims that the contractor did not secure the necessary

paperwork to permit it compensation for this work outside the original contract, and is thus precluded from any recovery of any kind. Counts VII through X are alternative to Count VI and claim that if the State is correct that the contractor failed to secure the necessary written authorization for such compensation for such extra work, it would be entitled to compensation under recognized rules of law of this Tribunal under the theories of reasonable reliance on erroneous contract documents, Count VII, estoppel, Count VIII, unforeseen count conditions, Count IX, and finally, under an account stated, Count X.

Having disposed of all the evidence on the other counts by virtue of an evidence deposition and the stipulation of fact, the parties proceeded to a one-day hearing on January 13, 1987, on the sound versus unsound concrete question. Again, helpful to the Court was the additional stipulation of fact, numbered paragraphs 65 through 105. For a better understanding of this question, set out below are paragraphs 71 through 75:

"71. The term 'delaminated' concrete refers to concrete that has deteriorated into separate layers and therefore unsound for further use. The Claimant's contract called for the removal of that concrete which was delaminated and its replacement with new concrete. It was discovered by the Claimant that separate areas designated for repair and restoration contained quantities of 'sound' concrete, 'sound' concrete referring to concrete that has not deteriorated or separated or has not visibly crumbled.

72. Exhibit 2-3, being the concrete division of the general conditions speaks to either the repairing of 'delaminated' areas, 'delaminated' concrete, 'removal of delaminated and deteriorated' concrete to sound concrete. Section 1.01.C, which other sections speak to the question and are affixed immediately hereafter.

73. Hanson Engineering Drawing S-2, Exhibit 28 (not in the compilation of exhibits set forth hereafter, and because of its size, it was left separate), speaks to removal to 'sound concrete.' Exhibit 2-1 talks about again the repairing of 'Deteriorated & Delaminated Concrete.'

74. 'Delamination' is defined in *Websters New Collegiate Dictionary*, Copyright 1979, as in part 'separation into constituent layers.'

75. Laminated is defined in the same dictionary as 'composed of layers of firmly united material.' "

The parties stipulated at paragraph 76 to the existence of a CDB synopsis dated April 4, 1984. Evans did not stipulate as to its accuracy; nonetheless it is useful for gaining insight into the problem as seen through the eyes of CDB. In part it reads as follows:

*"Issue*

This memorandum summarizes past activities for the above project. The issue of undiscovered conditions and significant change orders based on unit prices have complicated the execution of those change orders and the closeout of this project. At the current time all work, with the exception of some final overlay, is complete and the only issues remaining are change orders for removal of sound concrete and additional epoxy crack injection.

*Background*

* * * Unit prices were requested for eight items. Those which relate to the outstanding issues include (1) repair of deteriorated and delaminated concrete, partial depth, (2) repair of deteriorated and delaminated concrete full depth, and (3) pressure injection crack sealant. *No* unit price was requested for 'sound concrete,' which is the topic of most concern on this project.

The final bid documents did not include specific areas to be patched, but did include 'shaded' areas identified in the earlier design and which were to be repaired. The plans also noted that the A/E had resounded the concrete deck and had included an allowance for additional concrete repair which had probably deteriorated since the funds were frozen in March 1982. The base bid included an allowance for both full and partial depth patching which exceeded the 'shaded' areas marked on the construction documents.

* * * With paper work in order, the Notice to proceed was issued to Evans Construction Company on April 21, 1983.

The job got underway in late April and on May 27th (See Attachment C), Evans Construction wrote HEI with the following concerns: they alleged that the scope of the project had been increased because (1) the specifications and plans which refer to 'removal of all unsound and deteriorated concrete to sound concrete' had been discarded and Evans Construction had been instructed to remove 'sound' concrete, (2) the layout of the patched area shown on the drawings and (3) the depth of concrete removal required by HEI in the patched area had been increased beyond the one and one-quarter inch minimum patch specified. Evans also stated that they had instructed their subcontractor 'to proceed with the removal of all unsound and deteriorated concrete as required by the contract documents and not proceed further until an agreement can be reached on the (disputed factors).'

At a June 2, 1983 project coordination meeting (See Attachment D), the issue of sound concrete removal was addressed. Minutes of that meeting include

an apparent compromise to the above issue—the difference between the area marked to be removed and any removal required outside that marked area (now referred to as the propagated area) would be considered to be 'sound' concrete. The contractor was to measure and confirm with HEI the measurement for both the initial marked area and the propagated area. The contractor was to determine a quotation for unit cost removal of sound concrete.

In the time between the June 2nd meeting and a September 22, 1983 change order request for the contractor, it was not apparent to CDB management that the unit cost for sound concrete removal would be a major change order. The project manager had not notified his superiors of the magnitude of the change order. No communications exist from this period indicating the level of the possible unit process or the magnitude of the quantity of 'sound' concrete. The September 22 change order request for removal of sound concrete in Stage I (approximately 10% of the total contract area) amounted to $52,000. This was the first indication to CDB management of the size of the change order. There was still no indication of the magnitude of the balance to be received. In September, Jim Duda began discussions with the contractor and CDB's Estimating Unit regarding a fair price for removal of sound concrete. Difficulties were encountered in negotiating a price with the contractor, further delaying the process.

In December, the contractor provided records of a test performed in late June, which indicated that the subcontractors cost for removal of sound concrete to a partial depth was $20.44 per square foot and $22.09 per square foot for full depth. There was no notification of this test to either HEI or CDB until this point and the figures were taken at face value when reviewed by HEI and CDB's Estimating Unit.

Through subsequent discussions, which included the cost of replacing the removed concrete and an allowance for Evans' mark up on the subcontractor's work, several unit prices were considered. In December 1983, the project manager approved unit prices to Evans Construction of $25.65 for partial depth and $30.65 for full depth concrete removal *and* replacement (See Attachment E) * * *."

The parties throughout the contract in their correspondence with each other would refer to delaminated and deteriorated concrete as "unsound" and they would refer to concrete which was not deteriorated and not delaminated and which did not show a visible crumbling or separation from itself as "sound" concrete. In some instances, concrete which was unsound would be visible to the naked eye where it had visibly crumbled. Additionally, concrete which had not visibly crumbled might still have beneath its surface begun to deteriorate and break

up or delaminate. In the latter case, while visual inspection would not tell one of the delaminated condition of the concrete, some very simple methods are in common use within the construction industry to determine the quality of the concrete not visible to the naked eye.

The manner of determining whether the concrete is sound or unsound, is to use a "sounding practice." This practice is simply to run metallic substances onto the concrete in question and by virtue of the different sound occurring when the metal strikes the delaminated concrete, one can determine whether the concrete is sound or unsound. Concrete which is delaminated underneath the surface will give off a very hollow sound as compared to sound concrete which will give off a non-hollow sound.

Early on, Mid-Continental's manager of the project, Gene Caldwell, observed Dean Bricker, the on-site representative for Hanson, insisting that Mid-Continental, which was doing the excavation of the delaminated concrete, nonetheless also remove sound concrete.

Caldwell thus was required to make calls back to the head office in Fort Scott, Kansas, to the president of Mid-Continental, Jim Halsey, advising him of the circumstances. Further, Halsey observed that as the continued requests for removal of sound concrete were made, that the cost of the equipment and the requirement of new and different equipment to break through sound, hard undelaminated concrete was forthcoming. Thus it was on May 26 that Halsey came from Kansas to the jobsite to discuss with Caldwell, Warren Ogg, the representative for Evans, and James Duda, the senior project manager for CDB, his belief that he was being called upon to perform work clearly outside the scope of

the contract. Duda's suggestion was for Evans to write a letter to Hanson setting forth Mid-Continental's position.

On May 26, Halsey instructed Caldwell to cease removing sound concrete until given later directions to the contrary, and Ogg wrote to Hanson. The letter of May 26, after reciting the position of the subcontractor in regard to the request to remove sound concrete, concluded thus:

"We have instructed our subcontractor to proceed with the removal of all unsound and deteriorated concrete required by the contract documents and not proceed further until an agreement can be reached on the above factors.

After your review of these factors, we would suggest a meeting to discuss these matters." [Exhibit 32–2.]

The best way to understand the nature of the happenings on the jobsite is to review exhibits 61 and 80, testified to at pages 28 through 31. In essence, Hanson was expanding the job from simple removal of delaminated concrete within the red circled enclosure to sound concrete expanding out to the yellow line enclosure and including sound concrete or islands or peninsulas of sound concrete represented by the green within the red line.

On June 2, 1983, pursuant to Ogg's letter, a meeting was convened in Hanson's office. In attendance were all the principals, including James Duda for CDB. It was at that meeting that Gene Wilkinson, with his assistant, Dean Bricker, Hanson's representative, outlined the manner of proceeding further. He stated that CDB and Hanson for CDB were acknowledging that all work removing sound concrete was to be compensated for as an extra outside of the contract. He further set forth the manner in which the quantities of sound concrete were to be measured and further requested that Mid-Continental establish a unit price for this work outside the

contract. In no way did he detail or outline at that meeting how Mid-Continental was to establish the unit price, whether or not a time study was to be done, or in whose presence it was to be done.

Halsey, who has worked in as many as 18 States with the governing bodies of these States for this kind of work, left that meeting not yet persuaded to authorize his manager, Caldwell, to begin removal of the sound concrete. In fact, Caldwell was ordered by Halsey not to remove sound concrete until Halsey had secured the very written approval of CDB through Hanson for the change of the work, all as required under section 8.01 of the general conditions. Thus, it was only after Halsey received the written minutes signed off by Hanson agreeing that the sound concrete was to be compensated for as an extra, did he authorize Caldwell to begin removal of the sound concrete. That written authorization was forthcoming by virtue of Dean Bricker, for Hanson, writing up and signing the agreement set forth for CDB through its engineers in that meeting.

The minutes reflected distinctly the following things:

1. Mid-Continental was to sound, mark and measure the areas of unsound and deteriorated concrete with Hanson working with Mid-Continental to determine such square footage. (As was required under the contract.) That area is encircled in red on exhibit 61.

2. Mid-Continental was to establish a unit price for removing sound concrete.

3. Only after all the concrete was removed as to each stage were the areas that were patched (restored) to be measured by Mid-Continental and Evans (area encircled in yellow, exhibit 61). The difference between

what was finally patched (restored) and the measurements of the original area of deteriorated concrete, point 1 above, together with the islands of sound concrete within the red circle (colored in green on exhibits 61 and 62) was the basis for payment of sound concrete removal.

Mr. Duda characterized the result of the meeting thus:

"At this point the contractor had requested a cost adjustment for removal of sound concrete. Both the CDB Project Manager and Hanson Engineers recognized his claim as valid and agreed to discuss unit prices.

Had either refused to recognize the contractor's claim 30 days into Stage I, work would have stopped. The Underground Parking Garage was on a critical schedule due to high utilization by downtown business as well as tourist traffic during summer months." [Exhibit 70-2.]

On June 6, Dean Bricker, pursuant to the agreement of CDB embodied in the minutes of the meeting of June 2, met with Caldwell for the very purpose of discussing the method of sound concrete removal and the delaminated concrete removal. It was agreed that Caldwell would plot the patch areas over the drawings and estimate an area at each patch that was sound concrete removal. Bricker then was to look at what Caldwell marked on the prints and compare with the patch areas to see if his numbers were reasonable. On that day, Caldwell discussed with Bricker the idea of three different unit prices for removal of sound concrete but Bricker, nonetheless, said to Caldwell that he should, "for ease of recording unit price for sound concrete removal, limit" it to two different prices, one for full depth and one for partial depth.

On June 26, Gene Caldwell under the direction of Jim Halsey prepared his time study. Likewise, from that day forward, pursuant to the discussions with Bricker on June 6, Caldwell had ever present at his side a drawing, exhibit 62, which helped him record on a day by day

basis the amount of sound concrete he was removing within the red encirclement. This piece of work was on a portable workbench which was on an incline and wherever Caldwell went to remove sound concrete as they moved around the garage through its six stages that table, together with the inked drawing, exhibit 62, went with him. Further, Dean Bricker for Hanson observed these markings for the sound concrete removal, inquired what it was for, and was advised.

Then in the summer of 1983, the question came up as to how the paperwork would be effectuated to get approval for payment of whatever quantity was eventually determined to be done. Project manager James Duda instructed Warren Ogg that he was not to submit change orders for the sound concrete removal other than in three stages, with the first request for payment to be made only after completion of the concrete removal and replacement of stages I and II. He said in substance to Ogg that the reason he insisted that the request for payment not be made at any earlier date or in lesser increments was that CDB did not want to try to process many change orders under $50,000.00. Duda did not want these change orders strung out so that they would be in small amounts because it would be illegal to knowingly string change orders and Duda would not do that. Thus it was that the project manager and engineer were directing the contractor and subcontractor pursuant to written authorization for extra work to not make a payment request until it got over $50,000.00 so that those people who have authority to sign off at $50,000.00 would have the opportunity to pass judgment upon it. As far as Duda was concerned, the only thing remaining to be done was simply to get unit prices put together, run it through the CDB estimating section and then as a matter of routine it would be approved at whatever

level that may exist by way of amount. At the time Ogg was being advised by Duda of these decisions, it was obvious that stage II would not be completed until August. Thus, relying on the written authorization and command to remove sound concrete, both Evans and its subcontractor proceeded in accordance with the instructions of Hanson and Duda for the removal of sound concrete, and delayed request for payment of the same until the second stage had been completed.

The August 8, 1983, minutes of the pay progress meeting specifically listed that the change order for concrete removal at stages I and II was pending. (Exhibit 41, sec. 92.) Duda had been advised by his superior at CDB that CDB did not want to try to process any change order less than $50,000.00 and string them out throughout the job. Thus, he was specifically requesting Ogg to submit the change orders for sound concrete removal in three packages. This position of Duda was reiterated many times at the pay progress meetings.

Thus, it was that stage II came to completion in late August. During the prior three months, and subsequent to the June 2 meeting and with reliance on the written acknowledgment from CDB through its architect/engineer that sound concrete would be compensated, the following had taken place:

1. A meeting on June 6 with Bricker from Hanson and Caldwell had resulted in an agreement as to the manner of measuring sound concrete removal, and that only two unit prices and not three should be submitted for the sound concrete removal.

2. Halsey gave the go ahead to Caldwell to begin removing sound concrete after having received a copy of the written authorization.

3. A time study was done by Mid-Continental on June 26.

4. On a daily basis (exhibit 62) Caldwell for Mid-Continental was plotting the area of sound concrete removal and Bricker from Hanson was observing such recording.

5. Evans itself had paid for an outside independent contractor to do the measuring, and had one of its own employees assigned to that task.

6. Duda had told Evans not to submit the payment request until two stages had been completed so as to not violate the rule against "stringing" change orders out so as to keep them under $50,000.00.

7. At the August 8 pay meeting, the change order request for payment was listed as pending.

It was apparent that neither at the June 2 meeting, nor on into completion of stages I and II, had anyone thought through the ramifications *as to Evans* in allowing for removal of not only the delaminated concrete, but now for the removal of the undelaminated or sound concrete. The problem conceptually was somewhat difficult. Under Evans' contract it was to not only remove the bad concrete, but to replace it with good. The unit prices for first removing and second replacing concrete of a delaminated nature were combined at $7.00 and $10.00 for partial and full depth. Evans, having subcontracted the removal of the concrete, had retained the replacement aspect of the subject matter. Obviously, as far as Evans was concerned, it didn't add one penny to its cost of replacing with good concrete that which was removed whether what was removed was sound or unsound. What Evans was faced with irrespective of the same was a vacuum or a crater or a hole to fill up at

partial or full depth. It had always agreed to replace with good concrete whatever concrete was removed. Nonetheless, with an additional add-on to the contract for the removal of sound concrete, no thought was given as to handling the compensation to Evans for replacement with good concrete. As events played out, it was only when the request for pay and change order approval was being processed by Evans with the help of Hanson Engineers, that estimating first confronted the problem. And it was only after allowing compensation to Evans for its subcontractor's work of sound concrete removal, that it became necessary to establish a new unit price solely for the replacement aspect of sound concrete removed (paragraph 76 of the additional statement of fact above). The $7.00 and $10.00 unit prices submitted by Evans included both its cost of replacing the hole at $5.00 for partial depth and $8.00 for full, together with the cost of Mid-Continental of removing the unsound, deteriorated, delaminated, chiselled, cracked concrete.

Picking up from where the CDB narrative ended in mid-December of 1983, Duda wrote to Ogg on December 16, 1983, explaining estimating's acceptance of Mid-Continental's removal figures, and reiterating estimating's prior acceptance of Evans' $5.00 and $8.00 unit costs for replacement of concrete removed. This letter further reiterated that the previous request for $152,000.00 would be on the CDB report for the January 12 meeting in Chicago. That "upon approval, it would be added to your contract." The letter indicated that

"time has now passed to add additional items. The next scheduled meeting will be in Springfield on March 8, 1984. Please be advised that the cut-off date for this meeting will be February 8, 1984."

In essence, the letter also specifically noted that "all prices subject to the contractor's 5% mark-up." The letter ended with the note "sorry about the inconvenience, but

the high numbers mandate careful examination and Board approval."

Mid-Continental and Evans were by this time into the concrete work on stages V and VI. On January 6, 1984, Duda wrote yet again to Ogg, copying the engineers' and the contract section of CDB. That letter reiterated the December 16 letter decision as to sound concrete and further solidified that unit prices had been agreed upon for pressure injected crack sealant at $23.50 a lineal foot and the epoxy coated welded wire fabric at $2.35. The letter signed off with the following statement: "these amounts will be used in the final unit price adjustment change orders."

Thus, the written order approving the change on the contract to excavate sound concrete and to secure unit prices for the same had been fulfilled. Thereafter, in Duda's eyes it would simply be a matter of routine to secure Board approval. Duda signed off and approved the change order request for the sound concrete because of his belief then and his belief on the day he testified, January 14, 1987, that it was a correct request and that Evans was entitled to those monies.

On January 12, 1984, Eugene Wilkinson of Hanson appeared before the Capital Development Board, Board of Directors. Confronted with a change order proposal of $152,000.00 for an item outside of the original contract, and even then it being only for the first two stages of six, and confronted with a further overage on the epoxy crack injection whose total costs the Board was informed by Wilkinson might run as high as $225,000.00, the full Board of CDB drew back from executing any change orders in accordance therewith. This litigation ensued.

By the time of trial, the parties had stipulated to the quantities of sound concrete and unsound concrete that had been excavated and replaced with good concrete (paragraph 85 of additional statement of fact filed of record on February 20, 1987). At the hearing, as to what the proper value of the work done in all events under the manner or method of the contract documents, Mark Allen Bolten, a certified public accountant out of Kansas City, testified in respect to the unit cost per quantity of sound and unsound concrete excavated. Warren Ogg, for Evans, testified as to the unit cost for replacement with good concrete of that which was excavated. Again the parties are not in dispute as to the correctness of computation appearing in its exhibit 73-1 and taking into account the various adjustments in favor of CDB it is as follows:

*Adjustment*

| | | | |
|---|---|---|---|
| Unsound partial | 36,000 | (estimated) | |
| less | 718 | (actual) | |
| | 35,282 × $7.00 | = | $(246,974.00) |
| Unsound full | 11,437 | (actual) | |
| less | 4,000 | (estimated) | |
| | 7,437 × $10.00 | = | 74,370.00 |
| Sound partial | 2,335 × $20.72 | = | 48,381.20 |
| Sound full | 17,859 × $22.18 | = | 396,112.62 |
| Add 5% to sound concrete removal | | = | 22,224.69 |
| Add partial concrete replacement | | | |
| | 2,335 × $5.00 | = | 11,675.00 |
| Add full concrete replacement | | | |
| | 17,859 × $8.00 | = | 142,872.00 |
| | | | $448,661.51 |

In all events, thus, an award under Count VI, or alternatively under Count VII or VIII or IX or X would be $448,661.51, if any award is to be made at all.

Not making the situation any easier for any of the parties was the engineer's estimates of the quantities of partial and full depth, 36,000 square feet and 4,000 square feet getting turned upside down! Final measurements showed about the reverse, with partial depth excavation replacement at 3,053 feet (718 feet of unsound and 2,335 feet of sound partial depth) and 32,393 square feet of full depth excavation (17,859 square feet of sound concrete to full depth and 11,437 square feet of unsound concrete to full depth).

## C.
### Opinion

The presentation of this case is comprised entirely of exhaustive stipulations of fact and testimony on the Claimant's part that are uncontradicted. CDB called no witnesses. What comes through clearly is a belief on all of the participants' parts that the participants were marching *together* resolutely toward a day of presentation to the full CDB Board of first one and then additional requests for additional compensation, in each instance to exceed $50,000.00. The record is replete with joint efforts of the Claimant, the engineers and the project manager measuring the quantities and working together to reach an agreed upon unit price. Eventually the quantities were agreed upon and upon CDB's estimating section arriving at a unit price acceptable to the Claimant and its subcontractor, the engineers prepared requests for proposals which were intended to lead to the authorized change order approval and compensation, the subject matter of this suit. The participants without exception believed that once the

quantities and the unit price could be agreed upon it would be but a formality to secure the Board's signature.

All the while Evans and Mid-Continental were being commanded to excavate sound concrete and place five times as much epoxy as estimated in stages III through VI, September of 1983 through late February of 1984, Evans and Mid-Continental had every reason to expect that the request for additional compensation on stages I and II was proceeding in a somewhat routine fashion. Ironically, just as Evans and Mid-Continental were completing stage VI, they got the word that CDB's Board was completely rejecting the work of its estimating section and its project manager and its engineers as to the sound concrete and the epoxy crack injection. By that time, late February, any threat by Evans or Mid-Continental to stop the project would have been hollow, the project having been substantially completed.

What took place between early March of 1984 and the date this action was commenced in 1985 is unclear. At least as to the sound concrete, it had to be obvious to Evans and Mid-Continental that any attempts to process requests for additional compensation for stages III through VI would have been futile, although such requests were prepared by Evans and Mid-Continental with no processing taking place. As to the epoxy crack injection, however, there is still a strong hint that the full CDB Board itself never envisioned that the Claimant was not entitled to additional compensation for the agreed upon excess quantity completed. In May of 1984 the Board prepared a request for a proposal for a change order acknowledging the right to such compensation for the additional footage, far below what Evans had contracted for with Mid-Continental, $22.00 a lineal foot unit price, and far below the evidence introduced at the

evidence deposition. Conceivably it was CDB's hope that at least as to the epoxy crack injection the parties could come together at a compromised figure, somewhere between CDB's $14.65 and the $23.50 figure prepared by CDB's estimating section.

Evans for itself and its subcontractor in Count VI takes the position that the signature of Dean Bricker for the engineers was the only written signature needed to bind CDB to a legal duty to execute a change order that would necessarily follow in due course, absent of course any other legal reason that may otherwise have provided CDB with a legal right not to execute such change order. Evans argues that no such other events or facts have arisen that would exonerate CDB from abiding the written authorization of its engineer. CDB on the other hand argues that Evans and thus its sub could only have bound CDB's Board of Directors to execute a change order of the size here by securing such change order prior to beginning the work. Contract documents themselves, prepared by CDB and its engineer, do not speak in a crystal clear manner to this question. A plausible argument can be made that by virtue of sections 2.03 and 3.01 of the standard documents for construction, in a project such as this where whatever work is agreed to be done outside the contract and where the quantities of the same can never be known until completion, that the aforesaid sections having been complied with, that CDB through its architect/engineer had bound itself to the arrangement. These sections provide that CDB may issue orders and directions to the contractor through its architect/engineer and that CDB had a right and did designate Hanson as its authorized representative to act on its behalf. Further, that a request for an interpretation of the documents to facilitate proper execution of the same should be directed in

writing to the engineer and that where such interpretations constitute changes pursuant to article 8, the same should be promptly brought to the attention of CDB. It was at Mr. Duda's suggestion that Ogg wrote to Hanson, presumably under section 2.03 of the standard documents for construction which provided

"All requests for interpretation of the contract documents and clarification to facilitate proper execution of the work shall be directed in writing to the Architect/Engineer * * *."

Section 8.01 of the general conditions provided in part

"upon issuance of a change order the contractor shall promptly proceed to work as changed. *No work shall be changed without written approval of CDB.*"

Evans argues that the written approval of CDB was the sign off by Hanson Engineers to the June 2, 1983, agreement.

The evidence is also uncontradicted that in the ensuing months all the parties realized that the sign off by Bricker on June 2 was not the ultimate sign off that was required to get approval of payment. Evans had been told repeatedly that they were to present no formal request for change orders until the sum exceeded $50,000.00 as a fail safe method of making sure that the full Board of CDB would be well aware of the quantity of work encountered, it apparently being understood that this rule was not to be circumvented by "stringing along" change orders purposely in an amount below the $50,000.00. Evans has never maintained before this Court the lack of necessity of the Board's signature on change orders amounting to more than $50,000.00, though the contract documents themselves are totally silent of any such additional limitations or limitations on change orders. Additionally the contract documents speak about it being an integrated agreement in which all of the terms are set forth in them. Interestingly, it was

apparently only after this situation came to the attention of the full Board of CDB that CDB revised its standard conditions to now specifically set forth the limitations of its project manager on change order approvals. Still even now under the new standard conditions setting forth the limitations on change orders, the problem encountered here really cannot be spoken to inasmuch as the work being ordered is on a unit price basis, and the quantities will never be known until completion. It is therefore impossible to determine whether or not a specific change will engender a change order of $1,000.00 or $500,000.00 overall. Even now what the parties could have done as this situation was developing to have lessened the exposures that now exist is not clear. At first blush it is easy to suggest that on June 2, after the signature and agreement as to how the parties were to proceed, both parties should have done nothing more until they had come to an agreement on unit prices. However, the record is also clear that to get unit prices, some of the work on the removal of the sound concrete actually had to be done so as to perform time studies. Further, it is clear that even after the time studies were done and the parties began to negotiate, it took them as many as eight weeks to come to an agreement on the unit prices. In addition, the evidence is clear that this was a rush project and that the last thing CDB wanted was to bring the project to a standstill if negotiations on unit prices were going to take one, two, three or four weeks. Even if CDB's estimating section could come to terms with the Claimants on a unit price, the documents are silent as to whether or not estimating's agreement rose to the status of a change order request requiring the further approval and writing of the full CDB Board. Were the unit prices agreed upon initially, before any additional work was done, theoretically there was yet no

change order required since no additional work had been done. Conceivably the parties may have thereupon embarked upon change orders with an agreed upon unit price up to a specified quantity, at which time and measurement the work should have come to a halt, the change order been approved and a new change order prepared for additional work to be approved by the full Board. There is a distinct impression, however, that in the order of how things work in the field and in actual practice on a unit price contract, that such procedure would have been a severe hindrance at best and an absurdity at worst, resulting in a completion date long after that which was scheduled. It would seem though that Evans would have had a very strong bargaining position if the work had stopped.

This Court has gone to lengths to set forth what it perceives to be a fair presentation of the facts, particularly in light of the recommendations that it is going to make.

Evans argues alternatively that even if it be decided that it is not entitled under the contract documents to additional compensation for failure to secure the written approval of the full Capital Development Board prior to doing any of the additional work by way of quantity or sound concrete, nonetheless the activities set forth herein warrant an award to it under alternative theories of law. Evans claims that *Blades v. State* (1975), 30 Ill. Ct. Cl. 388, supports an alternative award. There, claimant was partially successful in a claim for extras for labor and material for which there was no written approval. It was unsuccessful insofar as it was unable to provide any evidence that the State had orally directed such work to be done, but conversely was successful in regard to the extra work for which it was admitted the State had

orally commanded the claimant to perform. In those instances where the State conceded that it had in fact commanded performance of the extra work prior to an authorized written change order, the claimant was successful. As to one of the claims allowed, claimant had submitted a written change order but CDB's predecessor, the Department of Public Works and Buildings, had taken no action on the same, yet thereafter commanded the work to be done. In this instance there was no dispute but that the additional quantity and nature of the work had been ordered by the engineers. CDB maintains that such orders were without authority. In *Blades*, however, the various extras involved were relatively small in value and it does not appear from the opinion that the person directing the changes lacked the authority to deal. Claimant also cites a case of *Divane Brothers Electric Co. v. State* (1957), 22 Ill. Ct. Cl. 546, in further support of an allowance for compensation based upon an oral modification of a written contract. The normal procedure in that case was for the ordering of extras by a direct authorization by letter from the supervising architect. In that case the project was on a critical time schedule and it would have taken 30 to 45 days before all the paperwork could have come through with the written formal order approving of the additional work, which in every instance would have been long after the work was already completed. Further, if the work was not allowed to proceed until the written authorization had been delivered, it would have been impossible to complete the project in a timely manner. Evans cites the *Divane* case for the proposition that having secured written approval from the engineer, that was all that was required, and alternatively if that wasn't all that was required, then the oral command to perform the work, based on the necessity for getting the

work done promptly, is sufficient authority to be awarded recovery. The evidence is clear that the underground parking garage was on a critical schedule due to the high utilization by downtown business as well as tourist traffic during the summer months. It is also clear that the securing of approval from the full Board of CDB was laborious as the parties struggled from September on to even get the proposal for a change order for stages I and II to a full Board meeting. They did not succeed until the January 1984 meeting. In *Divane*, however, the supervising architect who had the authority to issue written change orders had knowledge of the oral authorizations for changes, was present when the changes were discussed, and acquiesced in them. It is also significant that the Respondent did not pursue the defense that the changes were not properly authorized.

The Claimant also cites the case of *ARA Services, Inc. v. State* (1979), 32 Ill. Ct. Cl. 569, for the proposition that the State may waive provisions requiring modifications to be in writing by their affirmative conduct consisting of "requesting, ratifying and supervising the additional work." The record here is, of course, overwhelming that the project manager and the engineers, and the estimating section of CDB, commanded, requested, ratified and supervised the additional work both as to quantity and as to cost. The Court stated:

"There can be no clearer waiver of that provision than the fact that weekly meetings were held during the course of the disputed period which reviewed the work and authorized continuation of the work. The representatives of the State were at all times aware that changes were being made which extra compensation would be sought. They understood and consented to the procedure which was followed by Claimant. They agreed to provide a written modification but failed to do so after many requests. The waiver of the requirement that modifications to the contract be in writing is clear.

To allow the State to deny payment to Claimant by reason of its own derelictions in providing support services and in executing a written contract, while at the same time leading Claimant down the garden path in

orally authorizing work on a weekly basis would be a gross injustice." 32 Ill. Ct. Cl. 569, 572.

The Claimant further states that alternatively it is entitled to an award for the sound concrete on the basis of unforeseen conditions, citing *Grogan v. State* (1979), 32 Ill. Ct. Cl. 46. Its Count X sets forth verbatim four different instances where the engineers went on record as early as November of 1983 and as late as February 7, 1984, supporting a request for additional compensation based on the unforeseen conditions of the sound concrete (exhibits 57 through 60).

In *Grogan* the issue was whether or not the claimant was to be compensated for difficulties encountered in completing the work not foreseen by either party when the contract was executed. The work had been undertaken by Grogan only after the superintendent of buildings and grounds of the Secretary of State had orally assured the claimant that he would be paid for his additional effort which took approximately two weeks work. It was only after the work had been done that the claimant had been informed that he should submit a proposal for the after the fact rerouting of the sewer. No approval was ever forthcoming. In permitting recovery the Court in *Grogan* stated:

"The State may not abandon its prior position, upon which Claimant relied in relocating the sewer and excavating the rock from the job site. The record is clear that after the contract in question was executed, Claimant and the State of Illinois agreed to a modification of its terms." 32 Ill. Ct. Cl. 46, 48-49.

As to Count III and the epoxy crack injection, Claimant's position is that this quantity variance doesn't even fit in the rule of law concerning change orders, citing *Chism, Inc. v. State* (1967), 26 Ill. Ct. Cl. 181, and *Mass Construction Co. v. State* (1969), 26 Ill. Ct. Cl. 412, and indeed the language of the contract in those two cases was similar to the ones here speaking to the

question of increases or decreases in the number of units of work. Rejected out of hand was any argument by the Respondent that even in these unit contracts specifically speaking to possible variances in the estimated quantities, the formal change order request prior to the change is necessary.

To all of this the Respondent responds that:

"the Capital Development Board's limited agents feared that work would stop if massive changes in compensation were not made. Simply stated, Hanson and Duda ran amok, assuring the claimant that order beyond the scope of their authority would be approved by the contracting party. The Capital Development Board never agreed to purchase the extra work." Respondent's brief, p. 12.

The State's defense essentially is that the Claimant's extra work was all performed outside the scope of the contract and is therefore not compensable by this Court. Article 8.01 of the standard documents for construction provides that,

"Upon issuance of a change order, the contractor shall promptly proceed with the work as changed. No work shall be changed without written approval of the Capital Development Board." (Exhibit 3-2.)

The documents are part of Claimant's contract with the Respondent. The contract provides for only one method of modification and that method is an executed change order. In the case of a change exceeding the cost of $50,000.00, the change order may only be executed by the Board of Directors. Because it is clear that the change order was not executed, Respondent argues, no valid modification occurred.

It is this Court's decision that all of the arguments advanced by Evans on behalf of itself and its subcontractor, while credible and plausible, must carry lesser weight than the argument of the Respondent when it argues that all of the equities and legal theories favoring recovery by the Claimant must fail because of this being in essence an attempt to recover outside the terms of

the contract, and that even though this is a harsh disposition of the matter it simply follows that such must be the case as this Court must give deference to rules of law fashioned to protect the public monies. The apparent harshness of this rule is tempered by the fact that the situation was not totally beyond the Claimant's control. We remain unconvinced that Claimant could not have simply refused to perform pending execution of the change orders. That option may not have seemed practical at the time, but as indicated earlier, if Claimant wanted the work it would have been in a strong position to require the change order. Work stoppage could have occurred at any time.

For the foregoing reasons, judgment is rendered in favor of the Claimant on Counts I and II in the agreed sum of $75,941.60 and in favor of the Respondent on the remaining counts. Claimant has maintained throughout this case that this sum which was held as retainage bore interest and that Claimant is entitled to the interest. As a general rule this Court does not award interest. The Respondent has not contested the claim for interest, but we are unable to ascertain from the record if the interest is owed. For that reason we grant Claimant leave to file additional pleadings or evidence renewing its claim for interest within 60 days of the date this opinion is filed.

The parties have requested that this Court render findings as to what the Claimant's damages would have been had it prevailed, that is to say to put a price on the value of the extra work. Claimant intends to prepare and present its case to the Legislature seeking compensation for the extra work and such findings would facilitate preparation, presentation, and consideration of the bill. We find that the Claimant completed the job in a satisfactory and workmanlike manner and, had we

found this claim entirely compensable, we would have awarded the following sums:

| | |
|---|---|
| Count III: | $154,834.80 |
| Count IV: | $ 16,283.15 |
| Count V: | $ 16,355.74 |

Count VI:

| | | | |
|---|---|---|---|
| Unsound partial | 36,000 (estimated) | | |
| less | 718 (actual) | | |
| | 35,282 × $7.00 | = | $(246,974.00) |
| Unsound full | 11,437 (actual) | | |
| less | 4,000 (estimated) | | |
| | 7,437 × $10.00 | = | 74,370.00 |
| Sound partial | 2,335 × $20.72 | = | 48,381.20 |
| Sound full | 17,859 × $22.18 | = | 396,112.62 |
| Add 5% to sound concrete removal | | = | 22,224.69 |
| Add partial concrete replacement | | | |
| | 2,335 × $5.00 | = | 11,675.00 |
| Add full concrete replacement | | | |
| | 17,859 × $8.00 | = | 142,872.00 |
| Total, Counts VI through IX | | | $448,661.51 |
| Total, Counts III through IX | | | $636,135.20 |

For purposes of the award, the $75,941.60 in retention is payable from line item appropriation No. 141-51141-6600. For purposes of consideration of paying the balance on those counts for which compensation was denied, after paying the award $526,776.52 will have lapsed in line item appropriation No. 141-51141-6600 which funds had been appropriated for this project.

## ORDER

MONTANA, C.J.

This cause comes on to be heard on the parties' joint stipulation for settlement, due notice having been given, and the Court being advised, finds:

Claimant filed this claim seeking $651,851.10 in damages for breach of contract against the Respondent's Capital Development Board on July 3, 1985. On June 17, 1988, the Court entered an order awarding an agreed amount of $75,941.60[1] and found that the Claimant sustained damages in the amount of $636,135.20. The claim came back on a petition for reconsideration and request for oral argument. Oral argument was held. While the Court's decision was pending the parties filed a joint stipulation asking the Court to hold its decision in abeyance and later filed the joint stipulation for settlement which is now before us.

In relevant part the stipulation reads as follows:

"1. This claim arises from rehabilitation work at the Illinois Old State Capitol Underground Parking Garage, CDB Project No. 678-010-016.

2. The parties have investigated this claim, and have knowledge of the facts and law applicable to the claim, and are desirous of settling this claim in the interest of peace and economy.

3. Both parties agree that a settlement of $127,058.40 is both fair and reasonable.

4. Claimant agrees to accept, and respondent agrees to pay claimant $127,058.40 in full and final satisfaction of this claim and any other claims against respondent arising from the events which gave rise to this claim.

5. Claimant agrees to indemnify and hold harmless the Capital Development Board, its members, officers, staff, employees, successors and assigns, from any and all claims arising from, or a result of, the work at the referenced project, which may be brought by or on behalf of Hanson Engineers, Inc. or Mid-Continental Restoration Company, with respect to this the circumstances surrounding this claim."

---

[1]Payment of this award was vouchered on September 15, 1988.

This Court is not bound by such an agreement, but it is also not desirous of creating or prolonging a controversy between parties who wish to settle and end their dispute. Where, as in the instant claim, the agreement appears to have been entered into with full knowledge of the facts and law and is for a just and reasonable amount, we have no reason to question the amount of the suggested award.

The Respondent informed the Court that it has reviewed the necessary fiscal information concerning the funding for the project involved in this claim. The funds appropriated for the project were rolled over into FY91 appropriation No. 141-51141-6600-07-82. Therefore, Respondent can pay the agreed settlement now and without any action by this Court. Thus, there technically is no reason for the Court to approve or disapprove the settlement.

It is hereby ordered that this claim be, and hereby is, dismissed with leave granted to the Claimant to refile only if the Respondent fails to honor the obligation it entered into.